STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ARTURO BONANO, DEFENDANT-APPELLANT.

Argued September 28, 1971—Decided December 7, 1971.

*Mr. Edward P. Hannigan,* Assistant Deputy Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney; *Mr. Hannigan,* of counsel and on the brief).

*Mr. Jerome Jay Cohen,* Assistant Prosecutor, argued the cause for respondent (*Mr. Donald Bigley,* Camden County Prosecutor, attorney; *Mr. Cohen,* on the brief).

The opinion of the Court was delivered by

MOUNTAIN, J. Defendant was convicted of murder in the second degree. Following an affirmance by the Appellate Division, 113 *N. J. Super.* 210 this Court granted certification. 58 *N. J.* 97 (1971).

The essential facts are set forth in the opinion of the Appellate Division and need be only briefly restated here. On the evening of the fatal shooting, defendant, a resident of Camden, had gone to Philadelphia to play cards with friends. Before departing, for some reason which is not explained, he placed a loaded revolver in the belt of his trousers. Failing to find the diversion he sought, he returned sooner than had been anticipated and found his wife gone from home. She was in fact attending a christening party in the neighborhood. Upon her return shortly thereafter, defendant "smacked" her in the face, apparently because she had left the house without his permission. His eleven year old stepdaughter, a witness to the incident, hastened back to the party and informed her uncle Carlos, defendant's brother-in-law, of what had occurred. Carlos immediately armed himself with a knife from the kitchen and set out for his sister's home. The several statements of the actual encounter that ensued differ somewhat, but it is agreed that defendant was standing in the doorway of his home as Carlos approached the house and commenced to mount the porch steps. There was testimony that at about this point Carlos drew his knife and uttered some imprecation of a threatening nature. Defendant fired the revolver, with which he was still armed, inflicting a wound from which Carlos shortly died.

The ground of appeal which we think most significant relates to the right of a defendant to invoke the plea of self-defense as a justification for a killing, and more par-

ticularly the application of the doctrine of retreat as a corollary to this rule.

██ *N. J. S. A.* 2A:113–6 provides, in pertinent part, that "[a]ny person who kills another * * * in his or her own defense, * * * is guiltless and shall be totally acquitted and discharged." At early common law self-defense did not justify homicide. A defendant who slew another to save his own life was nevertheless convicted and forced to seek relief as a suppliant for mercy. "The man who commits homicide by misadventure or in self-defense deserves but needs a pardon." 2 *Pollock & Maitland, History of English Law,* (2d ed. 1898) 479. Later, of course, the right to protect oneself became recognized as a complete defense to a charge of homicide. This appears always to have been the law in New Jersey.[1] But self-defense may be successfully invoked only in those cases where the act of killing is necessary or reasonably appears to be so in order to preserve the defendant's life or to protect him from serious bodily harm. *State v. Hipplewith,* 33 *N. J.* 300, 316 (1960). "Self-defense is measured against necessity." *State v. Abbott,* 36 *N. J.* 63, 69 (1961).

██ This brings us to a consideration of the question as to whether, and under what circumstances, a man must retreat when confronted by an assailant, before he may justifiably kill another in his own defense. Specifically, was the defendant in this case, standing on the threshold of his own home, required to seek refuge indoors rather than resort to deadly force? The doctrine of retreat may be broadly stated as requiring one who is attacked to withdraw, before employing deadly force in his own defense, where there lies open a safe avenue of escape and he is consciously aware of this fact; he may stand his ground and not retreat, if he

---

[1] In the case of *The State v. Wells,* 1 *N. J. L.* 424 (Sup. Ct. 1790), the right of self-protection is clearly recognized as a complete defense to a charge of homicide. An *Act for the Punishment of Crimes,* adopted March 18, 1796, sets forth the defense in much the same language as that of our present statute. *Paterson, Laws,* 220 § 65.

employs less than deadly force. *State v. Abbott, supra,* at 71–72. The result of an improper resort to deadly force, within the concept of this rule, is to deny the defendant the benefit of a plea of self-defense. Some other jurisdictions reject the doctrine of retreat, holding that one who is attacked may defend himself, even to the point of killing his assailant, as long as he had a right to be at the place where he was attacked. See, for example, *State v. Blanton,* 111 *Ohio App.* 111, 170 *N. E.* 2d 754, 758 (Ct. App. 1960) ; *People v. Washington,* 54 *Ill. App.* 2d 467, 204 *N. E.* 2d 25, 27 (App. Ct. 1965) ; *Annot.* 18 *A. L. R.* 1279, 1283 (1922). This state has, however, heretofore accepted the doctrine of retreat as an expression of the more humane and enlightened rule. *State v. Abbott, supra.* We continue to adhere to this view. "When it comes to a question whether one man shall flee or another shall live, the law decides that the former shall rather flee than that the latter shall die." *Commonwealth v. Drum,* 58 *Pa. St.* 9, 22 (1868).

While we take the general doctrine of retreat to be settled in this State, the case before us presents an exception to this rule which has not hitherto been squarely presented to this court.[2] Must a man retreat when attacked in his own dwelling house? The well nigh universal rule, with which we are in accord, declares that under such circumstances no duty to retreat arises.

A man is not bound to retreat from his house. He may stand his ground there and kill any person who attempts to commit a felony therein, or who attempts to enter by force for the purpose of commiting a felony, or of inflicting great bodily harm upon an inmate. In such a case the owner or any member of the family, or even a lodger in the house, may meet the intruder at the threshold, and prevent him from entering by any means rendered necessary by the exigency, even to the taking of his life, and the homicide will be justifiable. [*Clark & Marshall, Law of Crimes* (7th ed.) Sec. 7.03, p. 493]

---

[2] A view in accord with the rule stated above is probably implicit in the holding in *State v. Pontery,* 19 *N. J.* 457, 475 (1955).

See also 1 *Wharton, Criminal Law and Procedure* (Anderson ed. 1957), § 239.

At this time, however, we limit our acceptance of this rule to those cases where the defendant is actually in his dwelling house. A porch or other similar physical appurtenance is deemed to come within this concept.

In *State v. Provoid,* 110 *N. J. Super.* 547, 554 (App. Div. 1970), Judge Goldmann noted that, "As to just what constitutes the limits of a 'dwelling,' the majority of jurisdictions in this country have concluded that the privilege of self defense without retreat extends to anywhere within the 'curtilage' of a man's home." This is, indeed, the majority view, and yet one may question its soundness. See *Beale, Homicide in Self-Defense,* 3 *Colum. L. Rev.* 526, 541–42 (1903). "Curtilage" is not a term that can in all cases be precisely defined. Nor are all definitions enlightening. For instance an early case in this state tells us that "One of the definitions of curtilage is, a field next to and belonging to a messuage. * * *" *Edwards v. Derrickson,* 28 *N. J. L.* 39, 44–45 (Sup. Ct. 1859). It may be seriously doubted whether a concept arising in the mediaeval land law furnishes an intelligent guide in determining whether the taking of a life is to be justified. What, also, of a disputed boundary line?[3] Is the justification for a slaying to rest upon the resolution of a title issue? If a defendant can show good title to the ground upon which he stood when he fired the fatal shot, is he to be exonerated, whereas if the land is later determined to be that of his neighbor, is he to be found guilty? Might not the better rule be that a duty to retreat should exist except as to the dwelling house itself, defined, as stated above, to include a porch or other similar appurtenance? This case does not raise the issue and we leave its resolution to another day.

[3]This issue appears to have been present in *State v. Abbott, supra,* at 67, but because of a charge by the trial court favorable to defendant, did not become matter of appellate review.

■ During summation the assistant prosecutor, in commenting upon the alternative courses of action open to defendant at the time of the encounter, said, "What could this defendant have done? Gone in the house and shut the door? Possibly." This statement was clearly capable of leaving in the minds of the jury the thought that the defendant perhaps should have retreated indoors rather than have done what he did. At the conclusion of the court's charge, which had made no mention of retreat, defense counsel asked that the charge be in this respect supplemented. He specifically stated, "I respectfully ask that Your Honor instruct the jury that the man doesn't have to run from his own home." After some further discussion during which the judge questioned whether the instruction should be given, defense counsel concluded, "I leave it to Your Honor's discretion." Nothing further was done. We think the court's discretion should have been exercised in favor of giving a supplementary instruction on the subject of retreat. Had the jury known that defendant had no legal duty to withdraw indoors, this knowledge would almost certainly have eradicated any doubt unfavorable to defendant that the assistant prosecutor's comment may have engendered. Furthermore, and quite apart from anything arising from the assistant prosecutor's remark, it would appear from the record that defendant was entitled to a charge to the effect that if the jury believed from the evidence before it that he was standing at his own doorway, that Carlos approached and commenced to mount the steps, that he drew a knife and threatened to kill defendant and that defendant reasonably believed he was in danger of losing his life or suffering serious bodily harm, he was under no duty to retreat but might stand his ground and resist the attack even to the extent of employing deadly force. Since the giving of such an instruction might well have resulted in an acquittal, the failure so to charge requires a reversal.

Since there must be a new trial, we deem it appropriate to consider another issue raised by the appellant which goes

to the correctness of the trial court's charge on the subject of manslaughter. No objection is made to the instruction given the jury upon this point in the principal charge. However, during the course of their deliberations, the jury asked that the definition of manslaughter be repeated. The judge, in complying, stated,

Now, what is manslaughter? Generally speaking, manslaughter is unintentional killing in the heat of passion or in hot blood where there is an adequate provocation. Although the crime of manslaughter is not mentioned in the indictment, you have a right and a duty to consider that offense. If you find, beyond a reasonable doubt, that the defendant did kill the deceased but that it was done when he had the intention to do less than great bodily harm, and that would necessarily mean less than the intent to kill, the crime is manslaughter, or if you should find, beyond a reasonable doubt, that the defendant did kill the deceased but that the killing was done in a sudden state of rage or in the heat of anger or with adequate provocation, the crime is manslaughter.

\* \* \* \* \* \* \* \*

Now, you may raise this question in your mind, "How do we possibly have manslaughter in this case?"

Well, I am not suggesting, because I have no right to suggest what verdict you should arrive at here, that is your province and it would be error for the Court to suggest what you should do in that regard, but if you were to find here that when the victim approached the defendant, and if he did brandish a knife and threatened this defendant, if you were to find that on the basis of that this man temporarily lost control of himself and he acted without any intent to kill but acted by reason of that alleged provocation and as a result shot and killed this man, then you could find that it was manslaughter;

Defendant contends that in confining manslaughter to unintentional killings and in stating that to justify a verdict of manslaughter defendant must have acted without intent to kill, the trial judge committed error. We agree.

 Manslaughter is nowhere defined in our statutes, although punishment for conviction of the crime is specified. *N. J. S. A.* 2A:113–5. Generally this crime is subdivided into (1) voluntary or intentional and (2) involuntary or unintentional, manslaughter. 40 *C. J. S., Homicide,* § 37, pp. 897–898; *State v. Prewitt,* 104 *Ariz.* 326, 452 *P.* 2d 500, 506 (1960); *People v. Miller,* 114 *Cal. App.* 293, 299 *P.*

742 (1931). The latter, involuntary manslaughter, is an unintentional homicide, committed without excuse or justification, under circumstances not manifesting or implying malice. *Clark & Marshall, supra,* § 10.12, *p.* 710; 1 *Wharton, supra,* § 272, p. 577; 40 *Am. Jur.* 2d, *Homicide,* § 70, p. 362. Death occasioned by driving an automobile without regard for the life and safety of others (now covered by statute, *N. J. S. A.* 2A:113-9), or causing death as a result of the reckless handling of a loaded firearm, are examples of the common law crime of involuntary manslaughter. *State v. Morales,* 111 *N. J. Super.* 521, 526 (App. Div. 1970), certif. den., 57 *N. J.* 433 (1971). See *Charge to Grand Jury,* 9 *N. J. L. J.* 167 (O. & T. 1886); *State v. Hardie,* 47 *Iowa* 647, 29 *Am. Rep.* 496 (1878). Quite clearly we are not here dealing with this kind of dereliction.

██ Voluntary manslaughter, on the other hand, is an *intentional* homicide done in sudden passion or heat of blood, without malice aforethought. *Clark & Marshall, supra,* § 10.11, p. 693. It has been said with respect to an intentional killing that "to reduce the crime from murder to manslaughter it must appear that the killing occurred during the heat of a passion resulting from a reasonable provocation, a passion which effectively deprived the killer of the mastery of his understanding, a passion which was acted upon before a time sufficient to permit reason to resume its sway had passed." *State v. King,* 37 *N. J.* 285, 300 (1962). This is the category of manslaughter that concerns us here. *State v. Guido,* 40 *N. J.* 191, 209–211 (1963); *State v. McAllister,* 41 *N. J.* 342, 353 (1964).

██ Defendant testified that he had had two earlier fights with his brother-in-law and that the latter, as he mounted the porch steps, drew the knife and said "I'm going to come and kill you." It was at this moment that the fatal shot was fired. If the jury did not credit defendant's testimony that he believed he was in danger of being killed or seriously injured, and hence rejected the plea of self-defense, but nevertheless did believe that Carlos made the

menacing gesture just described, it might properly have considered such conduct to be adequate provocation to reduce to manslaughter what would otherwise have been murder. We note, however, that the words themsleves, the verbal threat, would not have been sufficient to reduce the homicide from murder to manslaughter. The inadequacy of words alone to produce this result is well settled in this state.[4] *State v. King, supra,* at 301; *Clifford v. State,* 60 *N. J. L.* 287, 290–91 (Sup. Ct. 1897), aff'd 61 *N. J. L.* 217 (E. & A. 1897). See also *Warner v. State,* 56 *N. J. L.* 686, 691 (E. &. A. 1894). The court's charge, erroneously confining manslaughter to those killings which are unintentional, effectively deprived defendant of his right to have the jury weigh this alternative.

For the reasons set forth above the decision of the Appellate Division is reversed and the case remanded for a new trial.

*For reversal and remandment*: Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and MOUNTAIN—6.

*For affirmance*: None.

---

[4]The English law, formerly similar to ours and from which our rule was derived, was changed by *The Homicide Act,* 1957, 5 & 6 *Eliz.* 2 c. 11, Part I, 3, which reads:

Where on a charge of murder there is evidence on which the jury can find that the person charged was provoked (whether by things done or by things said or by both together) to lose his self-control, the question whether the provocation was enough to make a reasonable man do as he did shall be left to be determined by the jury. In determining that question the jury shall take into account everything both done and said according to the effect which, in their opinion, it would have on a reasonable man.