STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. LARRY POWELL, DEFENDANT–APPELLANT.

Argued November 27, 1979—Decided July 28, 1980.

*Edward Kopelson*, Assistant Deputy Public Defender, argued the cause for appellant (*Stanley C. Van Ness*, Public Defender, attorney).

*Kenneth N. Lipstein*, Deputy Attorney General, argued the cause for respondent (*John J. Degnan*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

WILENTZ, C. J.

On September 7, 1975, between 9:50 and 10:10 p. m., Debbie Couch was shot and killed in her apartment in Camden, New Jersey. The defendant Larry Powell, a police officer, was tried and convicted for her murder. The Appellate Division, 175 *N.J.Super.* 407, affirmed his conviction, and its determination is now before us for review.

Defendant's appeal from his conviction of second degree murder is rooted in the trial judge's failure to deliver a voluntary manslaughter instruction to the jury, which defendant claims was mandated by the presence of evidence in the record from which a jury could reasonably have concluded that the killing was done in the heat of passion resulting from reasonable provocation. In particular, defendant points to an inculpatory statement, put into evidence by the State, that he made to his

fellow officers, which was summarized by the Appellate Division as follows:

Essentially . . . the statement indicates a quarrel between defendant and the deceased, a subsequent struggle between them for possession of the gun in his waist when she tried to seize it from him and an unexplained or unexpected shooting of deceased with the gun while she was standing near a chair.[1] [At 411].

At trial, defense counsel suggested to the judge that the jury, if it believed the statement, could reasonably infer from it and other proof that the deceased tried to grab his gun and kill him, and that Powell, in a fit of rage, took the gun away from her and killed her. The trial judge refused to charge accordingly because he felt that the defendant's subsequent repudiation of his inculpatory statement and denial of any involvement at all in the shooting precluded issuance of a charge grounded in defendant's intentional conduct. Although the reason for this refusal was clearly in error, the Appellate Division affirmed because *it* concluded (a) that the disavowed statement did not support the delivery of a manslaughter instruction based on provocation/passion, and (b) that if such charge were appropriate, its omission was harmless. We disagree and therefore reverse. As is explained subsequently, the facts in the record below could support either a murder or manslaughter conviction. However, the trial judge charged first and second degree *murder* only. He also charged self–defense and accidental homicide, both of which would lead to acquittal. The jury convicted Powell of second degree murder. It carried a potential penalty of up to 30 years in prison, whereas conviction of manslaughter would have carried a penalty of up to 10 years in prison or $1,000 or both. The actual sentence was 28 to 30 years imprisonment, at least 18 years longer than the maximum sentence of imprisonment for manslaughter. Clearly, the trial court's omission of a charge supported by evidence in the record was harmful error—it eliminated the possibility of a conviction of a lesser offense.

---

[1]He disavowed this statement at trial, claiming that it was the product of coercion. His suppression motion was denied by the trial judge and the statement was introduced by the State. Powell denied the truth of the statement while on the stand and renewed his claim of coercion.

Debbie Couch, the deceased, was defendant Larry Powell's "common–law" wife. Together they had a daughter who was almost a year old at the time Debbie Couch was killed. The couple had been living together since shortly after the birth of the baby, and resided in the apartment where the homicide occurred. It is clear from the record that their relationship was unsteady, wavering from love to hate on various occasions. The couple argued often, about a variety of topics ranging from day–to–day housekeeping problems to defendant's relationships with other women. They quarreled on the morning of the homicide, and defendant packed up his clothes when he left the house, ostensibly to give the impression that he had had enough and was leaving the deceased. This conduct may have been provoked by the fact that the deceased herself was thinking of leaving him, although he denied knowledge of that fact at trial. As he put it, they were "playing cat and mouse." Powell's "partner" (a fellow police officer who worked closely with him) recalled a number of occasions on which Powell and the deceased had argued, at which times he had gotten so angry that he made threats against her, threats which his partner "knew" Powell had no intention of carrying out.

Our understanding of the chain of events that led to Debbie Couch's death is clouded by the fact that Powell offered two conflicting explanations of what transpired. The first account, a statement given to police early on in their interrogation, and repeated in court when the defendant was on the stand, "pinned" the shooting on retributive acts of a number of individuals who Powell thought "had it in for him." According to Powell, he returned home after an evening of "visiting" in Atlantic City, and found the deceased sitting in a chair. When he touched her, he realized she was dead. In this statement, he attributed her death to those individuals who were allegedly "out to get him."

Powell's second statement, obtained after hours of interrogation in the police station, described an "accidental" shooting that occurred when he arrived home and had another quarrel with the deceased, at which time she lunged for his revolver:

". . . I went up to the place and had an argument and she went for my pistol. She got it and I grabbed it and I was pulling it toward me and I turned it away from me and it went off. She fell on the chair." In this statement Powell described his alleged surprise on discovering that *Debbie* was the one who had been hit, having determined that *she* was in control of the gun and that *she* was the one who was going to shoot *him*. After the shooting, Powell walked out and began driving to Atlantic City. On the way to Atlantic City, he threw his gun out of the car, because "I started realizing, you know, it didn't really hit me what happened. You know, . . . I was just saying to myself I know this is not true, I know this didn't happen. You know I didn't realize . . . what happened then." At this point, the two statements merge and contain a single account of defendant's trip to his mother's house, to some bars, to a friend's house, etc., and his eventual return to the apartment where Debbie lay dead in the chair.

It appears from the record that the police were notified, and Powell went back with them to the police station to cooperate in the investigation of Debbie's death. He was subjected to approximately nine hours of questioning, during which time he issued the two statements just described. As noted above, Powell unsuccessfully sought to have the second statement suppressed on the ground that it was a product of coercion and had been obtained in violation of his *Miranda* rights.

The suppression motion having been denied, defense counsel pursued four inconsistent defenses: the first, to which defendant testified at trial, denying involvement and claiming an alibi (was in Atlantic City); the second admitting involvement but claiming misadventure (an accidental shooting); the third and fourth admitting involvement and intent to kill but claiming self–defense and provocation/passion respectively. All but the first arose from defendant's second statement to the police. The trial court charged on alibi, accident, and self–defense but refused to charge provocation/passion.

An analysis of the relevant legal principles applied to the facts in this case leads to the conclusion that a manslaughter instruc-

tion on provocation/passion was required. Defendant Powell is therefore entitled to a new trial.[2]

Since the case will be retried, we have considered the question, not raised below but first suggested in the briefs before this Court, whether the record supports a further manslaughter instruction based on imperfect self–defense. We conclude that it does and that such defense was available under pre-·Code law. Assuming substantially similar evidence on retrial, such charge should be given. While our discussion hereafter treats passion/provocation and imperfect self–defense together, we choose to base our reversal on the failure to charge manslaughter based on passion/provocation. While failure to charge imperfect self–defense, even though such charge was not requested, might otherwise require a reversal (see infra at 316, 318), the propriety of such reversal here is doubtful, for not only was there no request but the doctrine itself (imperfect self–defense) had not been explicitly recognized in this State. Thus we need not pass on this difficult question here.

The balance of our opinion will be divided into two parts. Part I discusses whether imperfect self–defense was available under pre–Code law to reduce second degree murder to manslaughter and Part II discusses the sufficiency of the evidence in this case to warrant manslaughter charges based either on provocation/passion or on imperfect self–defense.

---

[2]There are other facts not mentioned above that support the second degree murder charge and verdict. Specifically, the ballistics evidence offered by the State could serve to discredit Powell's testimony about a physical struggle for the gun, since that evidence could support a finding that the gun was more than 18 inches away from the deceased when it was fired. The same is true of the State's evidence as to the angles at which the bullets entered and exited deceased's body—such evidence could support a finding that she was in fact sitting at the time she was shot and killed. It should be noted, however, that upon cross–examination the ballistics expert testifying for the State admitted that his conclusions could not be afforded any degree of certainty because of the sparsity of evidence he received in making his analysis. His disclaimer went both to his testimony concerning an absence of powder burns as well as his testimony about the angle of entry of the bullets.

I

*Manslaughter Under Pre–Code Law*

■ Before the adoption of our new Code of Criminal Justice, *N.J.S.A.* 2C:1–1 *et seq.*, the substantive law of homicide was in a state of flux, particularly with regard to the interplay between the varying levels of culpability and legislative grading. A homicide committed intentionally could fit within the categories of first degree murder, second degree murder, voluntary manslaughter or justifiable homicide, depending upon the particular set of facts surrounding the killing.[3] Given such intent to kill, a finding that the killing was committed in the heat of passion resulting from legally adequate (reasonable) provocation [4] was a prerequisite to reduction of the homicide from murder to manslaughter. Because the manslaughter provision was so narrowly circumscribed, courts confronted with claims of mitigation focused on the emotional state of mind of the accused at the time of the killing, to see whether the circumstances surrounding the homicide could somehow be fitted into a provocation/passion category.[5] The situation was complicated further when the

[3]*See N.J.S.A.* 2A:113–2, degrees of murder, designation in verdict; 2A:113–5, manslaughter; 2A:113–6, killing by misadventure, self-defense or defense of others.

[4]Reasonable provocation is a legal term of art, encompassing a range of situations in which a victim behaves in such a way as to cause a reasonable man to lose his normal self–control. The traditional categories of provocative behavior are: battery, mutual combat, assault, illegal arrest, adultery and injuries to third persons. *See* Lafave & Scott, *Criminal Law* (1st ed. 1972) at 573.

[5]This problem was complicated by the similarly narrow reach of the justifiable (*i. e.*, non–criminal) homicide provision which limited invocation of a claim of self–defense to a situation where defendant (a) was not the initial aggressor, (b) acted in a reasonable belief that he was in imminent danger of bodily harm, and (c) used only that amount of force which he reasonably believed was necessary to overcome the risk of harm he was exposed to. *State v. Fair*, 45 *N.J.* 77 (1965). This provision did not cover unreasonable (imperfect) self–defense. Imperfect self–defense is applicable to a homicide committed where, at the time of the killing, the defendant believes the circumstances to justify or exonerate the killing, but defendant's belief is

courts were forced to look to the record themselves (without any request by counsel) for circumstances that could provide the inference of provocation/passion where an altercation had taken place. This sometimes became necessary, for example, in cases where the defense sought acquittal based upon an exercise of *perfect* self-defense when there was no claim that defendant had flown into a rage as a result of being attacked and acted "in the heat of the moment." We took this step ourselves in *State v. Bonano,* 59 *N.J.* 515 (1971). In spite of a record barren of evidence of any loss of self-control on the part of the defendant we pointed out that a defendant claiming self-defense would also be entitled to an instruction on provocation/passion, since menacing gestures by the victim could reasonably provoke fear and anger of such magnitude as to "effectively deprive the killer of the mastery of his understanding." *Bonano, supra,* at 523, quoting from *State v. King,* 37 *N.J.* 285, 300 (1962).[6]

Earlier, *State v. Williams,* 29 *N.J.* 27 (1959), extended the category of manslaughter to include the concept of partial justification[7] as a form of mitigation (from murder to manslaughter) where a police officer used excessive force in pursuit of his duties. We explained there that such an act constituted a "culpable error of judgment made in the stress of an encounter he did not invite," *id.* at 43, making a finding of malice (and thus second degree murder) inappropriate. We did so after

---

unreasonable. In other words, if a defendant was honest in his belief, but incorrect and unreasonable in his perception of the imminency of danger, or used an excessive and therefore unreasonable amount of force to repel such danger, a claim of imperfect self-defense would be appropriate. A number of states have codified imperfect self-defense as a category of manslaughter. (*See, e. g.,* Ill.Rev.Stat. 1969, Ch. 38, § 9-2(b)). New Jersey's codification is discussed *infra* at 313 n.9.

[6]It should be noted in this regard that a defendant requesting an instruction on manslaughter not only need not have *raised the issue* of provocation/passion as grounds for mitigation, but needn't have *come forward* with evidence thereof either when such evidence has been supplied by the State's case. *State v. Williams,* 29 *N.J.* 27, 44 (1959).

[7]*I.e.,* based on an honest but unreasonable perception of the quality of danger and the level of force required to repel that danger.

determining that a "parity of considerations" between a provocation/passion situation and a situation where a police officer was engaged in meeting physical resistance and was obliged to overcome it supported a finding of mitigation in *both* that represented a "fair concession to the frailties of man," *Williams, supra, quoting Brown v. State,* 62 *N.J.L.* 666, 710–11 (E. & A. 1899). Thus, even before adoption of the new Code of Criminal Justice, our case law had extended the definition of manslaughter to cover acts now characterized as excessive use of force where the act provoking the use of force could be analogized to adequate provocation producing a passionate response.

The logic that supports this extension of manslaughter would similarly justify a claim of imperfect self–defense where the exercise of "self–defense" was provoked by an act that clouded the defendant's perceptions as to the imminence of danger, the extent of the danger, or the amount of force called for to eliminate the danger.[8] Certainly, if Powell's perception of danger was unreasonable because he was in a state of fear or agitation because he had been attacked by his "wife," recognition of this fact in mitigation of the offense would likewise be a "fair concession to the frailties of man." Thus we hold that, in addition to the conventional provocation/passion manslaughter instruction, Powell will be entitled upon retrial to a manslaughter instruction based on a homicide committed in imperfect self–defense. While such category of manslaughter may represent some extension of prior case law, we hold that that was the law in effect at the time of the offense.[9]

---

[8]The only significant difference between an officer's use of force and a similar use of force by a member of the general public is that when attacked, the former has a duty to overcome the attack, whereas the latter often has a duty to retreat. Certainly, both involve situations where an individual is engaged in an encounter not of his own making, and must quickly evaluate the imminence of danger to himself and the level of that danger.

[9]We express no opinion on the availability, under the new Code of Criminal Justice, of a claim of imperfect self–defense for the purpose of reducing murder to manslaughter. Compare *N.J.S.A.* 2C:3–4, 2C:3–9, 2C:11–3 and 2C:11–4 as proposed and as enacted. For background, see, *Final Report of*

## II

*Appropriateness of Manslaughter Charges Based Either on Provocation/Passion or Imperfect Self–Defense in the Instant Case*

In determining whether a manslaughter instruction should have been given, the issues involved are: first, the inferences that properly can be drawn from the proofs in the case, and second (very closely related to the first), the quantum, or weight, of evidence needed to justify such a charge. As for the first, there are no legal rules as to what inferences may be drawn. The question is one of logic and common sense. As for the second, while different formulations exist, we believe the inferences that flow from the record in this case are more than sufficient, no matter what the test, to warrant submission of the manslaughter charges to the jury. We deal first with the "quantum of evidence" question.

■ Evidence of provocation/passion and imperfect self–defense can be used not only to support a charge of manslaughter but also to rebut the malice which the State must prove to warrant conviction of first or second degree murder. The quantum of evidence that is required may theoretically be different. The latter question is whether there is enough evidence of mitigation (provocation/passion or imperfect self–defense) to create a reasonable doubt in the mind of the jury that there was malice, and, consequently, a reasonable doubt that defendant committed murder (*i. e.*, requiring an acquittal thereof). That question implies a different quantum from the question whether there is enough evidence of mitigation to *support* the delivery of a manslaughter instruction (*i. e.*, on the evidence, could the jury find defendant guilty of manslaughter beyond a reasonable doubt?). Often these questions are not treated sepa-

---

the *New Jersey Criminal Law Revision Comm'n* (Oct. 1971), Vol. I, 2C:11–3 through 11–5, 2C:3–4, 2C:3–9, and Vol. II, Commentary, at 82–87, 94–95 and 162–165. *See also* Knowlton, "Comments Upon the New Jersey Penal Code", 32 *Rut.L.Rev.* 1, 5 (1979); DeCicco, "Proposed New Jersey Penal Code", 1 *Crim.Jus.Q.* 164, 169 (1973).

rately, and can cause considerable confusion. It is not clear, for instance, that in the instant case any consideration was given to the necessity of instructing the jury as to the effect that evidence of mitigation would have in determining *guilt or innocence* of second degree murder. Apparently all parties assumed that mitigation due to provocation/passion was relevant only on the issue of whether a manslaughter charge should be given. Whether or not the evidence is sufficient to warrant an instruction on manslaughter, a trial judge must make the State's burden clear by instructing the jury that to find malice it must be convinced beyond a reasonable doubt that the accused did not kill in an exercise of imperfect self–defense or in the heat of passion caused by inadequate provocation,[10] unless there is no evidence of mitigation (either provocation/passion or imperfect self–defense) in the record.

The trial judge's partial recognition of this obligation here is evident from his charge on second degree murder:

> Murder in the second–degree includes all cases of murder which do not constitute first–degree. It is distinguished by the absence of one or more of the mental operations of willfulness, deliberateness or premeditation required by the law to constitute murder in the first–degree. Thus, where the design or plan to do grievous bodily harm without intent to take life or if the killing being intentionally done, or without deliberation or premeditation, or where the act is done in the heat of anger or *without* reasonable provocation, the crime is murder in the second–degree. [Emphasis supplied].[11]

---

[10]Under *Mullaney v. Wilbur*, 421 *U.S.* 684, 95 *S.Ct.* 1881, 44 *L.Ed.*2d 508 (1975), the prosecution must prove beyond a reasonable doubt every fact necessary to constitute any crime charged; therefore, to prove murder, the prosecution must prove malice. To do so, it must show that the accused did not act in the heat of passion on sudden provocation. A failure to charge accordingly violates defendant's Sixth and Fourteenth Amendment rights. *See also State v. Thomas*, 76 *N.J.* 344, 359 (1978); *State v. Christener*, 71 *N.J.* 55, 64–65 (1976).

[11]We assume that the above quoted paragraph reflects errors in transcription and that the trial judge correctly stated the law of second degree murder as applying where (1) a design or plan to do grievous bodily harm *is* without intent to take life or (2) the killing is intentionally done *but is* (a) without deliberation or premeditation or (b) done in the heat of anger without reasonable provation.

However, his charge was incomplete, in that it only addressed passion *un*reasonably provoked, leaving the jury uninstructed on the effect of legal provocation that induces a passionate response (as well as the separate factor of imperfect self–defense). As a result, the jury received no guidance as to mitigation, either as it affects or rebuts malice, or as a potential basis for an alternate verdict (manslaughter). If the evidence before them indicated *to them* that Powell intentionally killed the victim, either in imperfect self–defense or in the heat of passion provoked by fear or anger (resulting from the deceased's lunge for Powell's gun and the struggle that ensued), the jury was not provided with an optional verdict that reflected mitigation (other than second degree murder). Moreover, they may not even have known that it was their duty to acquit if they believed that the evidence pointed to the presence of adequate mitigating factors.

After instructing the jury on the effects of evidence of mitigation in a second degree murder prosecution, a trial judge must decide whether a manslaughter instruction is appropriate, given the facts of the particular case. Usually, the question arises when defendant requests the manslaughter instruction.[12]

---

[12]In this situation, there is usually no question of "sufficiency of the evidence" to support a manslaughter conviction, since the trial judge has already determined that the evidence supports a murder charge. That evidence (of the killing, the accused's intent, etc.), coupled with almost any evidence of mitigation, has been held to justify a manslaughter instruction. ". . . [A]ll that needs to be shown is the slightest amount of evidence regarding the underlying theory [*i. e.*, imperfect self–defense, provocation/passion]. *People v. Hall*, 25 *Ill.App.*3d 992, 324 *N.E.*2d 50 (5th Dist. 1975). It is interesting to note that in Pennsylvania, a defendant charged with a murder is automatically entitled to an instruction on manslaughter, whether or not evidence of mitigation exists in the record. The policy behind this automatic rule stems from an historical argument that a jury's mercy–dispensing power must be respected by leaving the possibility of a reduced verdict open at all times. We do not advocate use of such an automatic rule in this State. However, we do think that recent case law in a majority of jurisdictions supports the "scintilla of evidence" threshold for delivery of a manslaughter instruction in a murder prosecution.

We note also defendant's argument that where a self–defense instruction is appropriate in a prosecution for murder, an instruction on imperfect self–

. . . [I]n homicide cases, if there is evidence in the record which, if believed by the jury, would reduce the crime to voluntary manslaughter, an instruction defining that crime should be given, if requested. [*People v. Joyner*, 50 *Ill*.2d 302, 278 *N.E.*2d 756, 759 (1972) (citations omitted)].

■ A defendant is entitled to such instruction whether or not manslaughter is consistent with the theory of his defense:

It is a set.led rule that where there is evidence which if believed by a jury would reduce a crime to a lesser included offense, an instruction defining that offense should be given. . . . This rule is applicable even if the theory of defense is inconsistent with the possibility that the defendant is guilty of the lesser crime. . . . A defendant in a criminal case is entitled to have the jury consider any legally recognized defense theory which has some foundation in the evidence, however tenuous. . . . Very slight evidence on a theory of defense will justify the giving of an instruction. [*People v. Dortch*, 20 *Ill.App.*3d 911, 314 *N.E.*2d 324, 325–26 (1st Dist. 1974) (citations omitted)] [13]

Although a manslaughter instruction is usually requested by a defendant, as was the case here, it is conceivable that the State could be the party seeking such an instruction, or the court could consider delivery of such an instruction on its own where neither party has made a request therefor. Where the State requests a manslaughter instruction, a defendant might oppose such an instruction for a variety of reasons, including the possibility that it provides a vehicle for a "compromise" verdict, perhaps lessen-

---

defense/manslaughter is *necessarily* appropriate as well. While we are unwilling to advocate adoption of a *per se* rule like the one used in Illinois, *see People v. Zertuche*, 5 *Ill.App.*3d 303, 282 *N.E.*2d 201 (2d Dist. 1972), cf. *People v. Tiller*, 61 *Ill.App.*3d 785, 18 *Ill.Dec.* 818, 378 *N.E.*2d 282 (5th Dist. 1978), it seems clear that the evidence in this case could lead a reasonable jury to conclude that defendant killed Debbie Couch in response to an unreasonable perception that his own life was in danger, or that such perception was reasonable, but defendant used excessive force in combatting the danger. Certainly when the trial court here decided the evidence was sufficient to warrant charging the jury on self–defense, it undoubtedly would have—had anyone called its attention to the issue—concluded that the very same evidence could be used to support an imperfect self–defense charge.

[13]The posture of the *Dortch* case is strikingly similar to the case before us:

It is clear that if the State's evidence is accepted as true and the defense evidence rejected, defendant committed murder when he shot and killed Lerdie Dortch. . . . It is equally clear that if the defense evidence is accepted as true and the State's evidence rejected, defendant committed a justifiable homicide or, at most, voluntary manslaughter. [314 *N.E.*2d at 325].

ing what he perceives to be a strong possibility of a verdict of acquittal. However, when faced with this problem in *People v. Sykes,* 45 *Ill.App.*3d 674, 4 *Ill.Dec.* 64, 359 *N.E.*2d 897 (5th Dist. 1977), the Appellate Court of Illinois *rejected* defendant's "all or nothing" theory. *See also State v. Mathis,* 47 *N.J.* 455 (1966); *cf. State v. Christener,* 71 *N.J.* 55 (1976); *State v. Harper,* 128 *N.J.Super.* 270, 276 (App.Div.1974).

▪ Since it is claimed here that no request for a manslaughter charge was made (or, if made was thereafter withdrawn) we deem it appropriate to use this occasion to set forth our view of the duty of a trial court in a murder case to charge the applicable law to the jury based upon the facts *regardless* of what requests counsel may make. We express no opinion here as to the *effect,* on appeal, of a failure so to charge where no request has been made. Rather we shall state the *duty* of the trial court when similar circumstances present themselves.

It is assumed, correctly, and almost without the necessity of discussion, that where the indictment is for first degree murder, the trial court will charge second degree murder as well if the evidence tends to support it regardless of the requests counsel may or may not make. That is not because there is something different about second degree murder (other than the fact that it is the presumed degree of murder) but rather that it is so well known and so closely related to first degree murder that no particular need for a special request seems necessary. Similarly, where the facts clearly indicate the possibility that the crime was manslaughter based upon either provocation/passion or imperfect self–defense, we see no reason why the trial judge should not also be obliged, even without any request being made, so to charge. Furthermore, we question whether it is proper for the trial court to omit such a charge simply because defense counsel specifically requests that it not be given, even where the prosecution concurs in that request. If that agreement between counsel reflects their belief that there is insufficient evidence to warrant such a charge, that is one thing; certainly a trial court would seriously consider counsel's concurrence as indicating a high degree of probability that there is indeed insufficient

evidence. Where, however, counsel's concurrence that no such charge be given, in the face of obvious record support for such charge, is based on their conclusions as to optimum strategy (defense counsel believing that the charge will impede what is believed to be a substantial chance of acquittal, the prosecution that it will impede what it believes to be a substantial chance of conviction of first or second degree murder) the manslaughter charge should be given to the jury. There is a third party involved (represented by the jury): the State itself, on behalf of its citizens. Their interest is paramount, even more important than preserving the "purity" of the adversary system, especially when there seems to be no justifiable end served by that system in this particular situation. Very simply, where the facts on the record would justify a conviction of a certain charge, the people of this State are entitled to have that charge rendered to the jury, and no one's strategy, or assumed (even real) advantage can take precedence over that public interest. It matters not that the defendant's counsel may be *correct* in the belief that acquittal is more likely without such charge, or that defendant himself is willing to take that chance; nor does it matter that the prosecutor is content to forego the manslaughter instruction in the hope that a conviction of murder will result. The judge is more than a referee between contestants. He is the law's representative, and it is his duty to see that the will of the law is done. The real function of the adversary system is to help him fulfill that duty.

We come then to the question of what inferences can be drawn from the facts that are presented to the jury. The distance a court will go is shown fairly well in *State v. Bonano*, *supra*, where this Court, evaluating evidence introduced to support a claim of self–defense, found that a manslaughter charge based on provocation/passion was justified despite the total absence of any suggestion that defendant became angry. All that was before the jury in that case was that defendant might have thought that the victim was trying to harm him, and that some gesture on the part of the victim had been made. Based on that provocation, defendant shot and killed the victim; the

sole explanation offered was that he did so in self–defense. We there held that, on such evidence, defendant was entitled to an instruction on provocation/passion *as well as* an instruction on self–defense. We did this because

> [i]f the jury did not credit defendant's testimony that he believed he was in danger of being killed or seriously injured, and hence rejected the plea of self–defense, but nevertheless did believe that [the victim] made the menacing gesture just described [victim drew his knife and uttered some implication of a threatening nature], it might properly have considered such conduct to be adequate provocation to reduce to manslaughter what would otherwise have been murder. [59 *N.J.* at 523–24].

Obviously the Court concluded that the inference of provocation/passion was a reasonable one to make where the defendant believed that the victim was trying to harm him. Since such an inference was found reasonable on the bare facts presented in *Bonano*, we find no basis for concluding otherwise in this case. The evidence available in this record with regard to the emotional state of both defendant and victim at the time the killing occurred is far more persuasive than *Bonano* that a provocation/passion situation existed.

■ The State's evidence alone in this case was sufficient to justify delivery of a manslaughter instruction. The focal point of the State's case is Powell's "disavowed" statement, which the Appellate Division characterized as follows:

> In the disavowed statement defendant asserts the following: There was an argument between him and the deceased in the apartment. She "went for his" gun, which was on his person, and she "got it." Defendant grabbed it, was pulling it toward himself and then "turned it away" from himself, at which time it went off. The deceased then fell on a chair. During the course of the quarrel, she came at him, he pushed her away, she came back at him and his shirt "went up." She then grabbed for the gun that was in his belt, and she "had it and that's when there were shots from the gun." When she had removed the gun from his belt during their struggle, he "thought" it was pointed in his direction, and "figured I was gone so when I first heard the shots, I was surprised . . . like I was supposed to be hit but it was her" when the first shot was fired. He removed the weapon from her. "It was like in both of our hands" while they were struggling for the weapon. When the gun went off, both of them had possession of it; he was trying to "wrestle" it from her. He also stated that the gun went off "while it was in her possession." The weapon discharged more than once. She was standing "by the chair" when this happened. He later disposed of the gun on the highway after leaving the apartment to go to Atlantic City. He was asked whether he cared to add anything to the statement. He answered, "the only thing is that it was an accident."

When confronted with a defendant's (or any other witness's) account of a particular chain of events, a jury must decide how much, if any, of the testimony given is accurate. The State attempted to convince the jury that none of Powell's story was true except for his admission that the killing took place in his presence, that he was involved, and that he was lying to protect himself—the "surprise" that she, not he, was shot allegedly being the clearest indication of its untruthfulness. The State claimed that the defendant shot the victim three times, and pointed to its ballistics evidence (lack of powder burns and residue on victim) as proof that defendant was not in close physical proximity with the victim (*i. e.*, struggling) when the shooting occurred. The prosecution also pointed to further ballistics evidence that the victim was seated before the shooting ended (angle of bullet embedded in the chair) to support a claim of intentional killing, accompanied by an absence of continuous struggle necessitating self–defense. Finally, the State presented testimonial evidence of the unsteady nature of defendant's relationship with the victim and of defendant's "flight" from the scene in support of its claim of willful and deliberate murder.

We conclude that the very same evidence could reasonably have produced an inference of muted passion between Powell and Debbie Couch that erupted when they argued and she lunged for his gun, and caused Powell's reason to crumble. Alternatively, the same evidence could produce an inference that when Powell and Couch struggled for the gun, he believed that she was trying to kill him and he shot and killed her in self–defense.[14] We see no basis for differentiating between

---

[14]Note, in this regard, that on cross–examination, the State's ballistics expert qualified his testimony about the shooting by admitting the speculative nature of his conclusions due to lack of more physical or testimonial evidence. The jury could have decided to discount his testimony (that the victim was shot from a distance greater than 18 inches) as a result, and chosen instead to believe defendant's account of a physical struggle for the gun during which the shooting took place. Alternatively, the jury could have determined that at least one shot was fired at close range during a struggle, and that once the victim fell into the chair, defendant, dispossessed of his senses, continued to fire at the victim.

perfect and imperfect self–defense in this situation–the same evidence that caused the trial judge to instruct on perfect self–defense justifies an instruction on an unreasonable exercise thereof. It is essential to bear in mind that defendant's use of the evidence to support a manslaughter instruction need only be plausible, it need not be the most probable explanation. The measure of probability is for the jury once the claims of the parties have passed the threshold of possibility.

When *all* of the evidence before the jury is considered, we believe that it supports a different scenario; a scenario that was not put before the jury for its consideration due to the erroneous omission of a manslaughter instruction.

On the morning of the homicide, Larry Powell and Debbie Couch had an argument, which left both of them very upset. Powell packed up his clothes, "playing cat and mouse," trying to lead Debbie to believe that he was moving out of the apartment that they shared. Perhaps he knew that she had similar intentions and wanted to be the first one to break up the relationship. Perhaps he wanted her to ask him to stay. In any event, he left the apartment and came back much later in the day, in the afternoon. He walked into the house and almost immediately he and Debbie began to quarrel over some minor household matter, perhaps picking up where they had left off that morning. "It was an emotional thing." Suddenly, Debbie lunged for Powell's gun, which he carried on his person. Powell grabbed her hand, in which she held the gun, and tried to pull it away from her, and it went off. While it seems unlikely that it went off accidentally three times (although the trial judge *did* charge accidental homicide), it would not be unreasonable to find that perhaps it went off once accidentally, Debbie slumped into the chair, and Powell, now in possession of the gun, in a fit of rage over Debbie's attempt to kill him, kept shooting, either in fear that she would get up again to attack him or simply in anger at the thought that she would do such a thing. He knew that she had a gun of her own somewhere in the apartment, and believed her fully capable of shooting someone. Most likely he fired all shots in total rage at the thought that the woman with whom he

lived, the mother of his child–perhaps the woman whom he loved–would even think of killing him. After firing the shots, he ran out of the house, still in a rage, taking the gun with him. He jumped in his car and started driving in the direction of his mother's house. On the way what had happened didn't really "hit him" at first, but as it did, he couldn't believe it, he knew it wasn't true, as if someone else had done it. But then, perhaps finally beginning to realize what had happened, he threw the gun out of the car. After a number of drinks and a number of stops and visits with various friends, he finally cooled off and realized the gravity of what had happened. He returned to the apartment and found Debbie lying in the chair and their baby on the floor next to her mother. Frantically, he began knocking on doors, in an effort to find someone who could help him get the police. Eventually, the police were called and came to the scene to discover Mr. Powell sitting in the apartment waiting for them.

Knowing the relationship between defendant and victim, knowing that they had argued many times before, knowing that Powell had been driven to anger on various occasions and had even threatened to do physical harm to Debbie, and that she in return was prepared to move out of the house because she was unhappy, the jury could easily have concluded that a lovers' quarrel occurred in which Powell was provoked by Ms. Couch's attempt on his life, which attempt deprived him of his senses, and caused him to kill her in a fit of rage. Such a conclusion could have been reached from the very evidence on which the State based its murder prosecution, and could have been buttressed by circumstantial evidence in the record about previous arguments between the defendant and the victim, any of which might have resulted in the turn of events that finally transpired on September 7, 1975.

One might also conclude from the record, of course, that the evidence of cold–blooded murder, even if not premeditated, was overwhelming compared to this suggestion of a crime of passion based on reasonable provocation. For instance, it may be that Powell walked into the home and for some reason decided to kill

her and pulled out his gun and shot her three times. No motive whatsoever has been suggested by anyone for such behavior other than those same circumstances which much more strongly portray a lovers' quarrel and a shooting in a fit of rage. No one has suggested why a policeman, presumably trained in the use of the firearm he regularly carried, would find it necessary, at relatively close range, to shoot his lover three times rather than just once, unless he had lost all reason. All can agree that Powell, despite his statement to the contrary, never believed that when the gun went off he thought *he* was the one going to be shot, but there is not one shred of evidence to rebut his statement that they had a fight and that she tried to get the gun from him first.

A court need not *accept* the suggestion that these were two ordinary, fallible human beings who couldn't get along, who argued, loved and hated each other, and who ultimately drove themselves to a tragedy arising from a furious argument when each threatened and actually attempted to kill the other; a court *might* find a conclusion that, all this evidence of passion to the contrary notwithstanding, a cold–blooded murder was more likely. That is no reason however, to deprive the jury of the right to find otherwise. Not even Powell's own lies about alibi or about accidental shooting (assuming they were lies) should deprive the jury of the right to find the truth, and to base its verdict on that finding.

For the foregoing reasons, we reverse defendant's conviction and remand for a new trial in accordance with this opinion.

SULLIVAN and CLIFFORD, JJ., dissenting.

We would affirm the judgment substantially for the reasons expressed in the opinion of the Appellate Division, reported at 175 *N.J.Super.* 407 (1979).

*For reversal and remandment* –Chief Justice WILENTZ and Justices PASHMAN, SCHREIBER, HANDLER and POL-LOCK–5.

*For affirmance* –Justice SULLIVAN and CLIFFORD–2.