In sum, the trial court properly dismissed ECM's contract claim.

Affirmed in part, reversed in part and remanded for further proceedings.

777 A.2d 1035

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. CHARLES JAMES, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted July 17, 2001—Decided July 26, 2001.

Before Judges STERN and STEINBERG.

*Peter A. Garcia,* Acting Public Defender, attorney for appellant, (*Stephen W. Kirsch,* Assistant Deputy Public Defender, of counsel and on the brief).

*John J. Farmer, Jr.,* Attorney General, attorney for respondent, (*Linda K. Danielson,* Deputy Attorney General, of counsel and on the brief).

Appellant filed a *pro se,* supplemental brief.

The opinion of the court was delivered by

STERN, P.J.A.D.

Defendant was convicted in 1991 of committing a second degree aggravated assault upon Raymond Jimenez ("Jimenez") on or about August 11, 1990, contrary to *N.J.S.A.* 2C:12–1b(1). He was sentenced on May 24, 1991, to the custody of the Commissioner of the Department of Corrections for ten years, with five years to be served before parole eligibility, consecutive to a sentence defendant was then serving. In its responding brief to defendant's

direct appeal, the State described the underlying facts proved at trial involving defendant's attack on Raymond Jimenez, his foreman at work.[1]  The defendant threatened Jimenez because of his objection to defendant's tardiness and erroneous time card. Thereafter:

According to Mr. Jimenez defendant "blindsided" him.  Mr. Jimenez' eyeglasses broke and flew about 10 feet.  The glass from the eyeglasses went into Mr. Jimenez' eye.  There was blood everywhere and Mr. Jimenez could not see out of one of his eyes.  Defendant continued to hit Mr. Jimenez, so Mr. Jimenez covered his face and fell to his knees.  Mr. Jimenez' whole face was covered with blood with a steady dripping of blood across his entire face.  When defendant stopped hitting him, Mr. Jimenez walked to the office and left a trail of blood behind him.  Mr. Jimenez asked defendant why he had hit him, and defendant made reference to the victim being "on [his] butt" for being late.

As a result of defendant's assault upon him, it was necessary for Mr. Jimenez to undergo emergency eye surgery that same day.  The surgery was performed by Dr. Michaels, the senior op[h]tha[l]mologist at Bridgeton and Salem Hospitals. Mr. Jimenez had sustained a laceration of the cornea of his eye, and lacerations of the upper and lower eyelids.  The retina of the eye was prolapsing outside the wound, there was fluid from the back of the eye coming forward and there was blood between the cornea and the retina.  Mr. Jimenez had no light perception in the eye.  If he had not received the emergency surgery, Mr. Jimenez would have lost the eye.

Mr. Jimenez remained in the hospital for two days, and was required to wear an eyepatch for two weeks.  Mr. Jimenez continued to have impaired vision for about two months, and eventually regained his full vision.  A permanent scar remains on the retina of Mr. Jimenez' eye, and his pupil remains permanently misshaped.  At the time of defendant's trial, seven months after this incident, Mr. Jimenez was still seeing Dr. Michaels for aftercare.  As a result of the injury to his eye, there was a chance that Mr. Jimenez' other eye might be susceptible to an inflammatory condition, so it had to be watched for at least a year to assure that this condition did not develop.

---

[1] The State's brief on the direct appeal is appended to defendant's present brief.  We refer to the State's brief, as opposed to accepting defendant's recitation for purposes of the issue we decide, only because the defendant's statement of facts before us is short and merely states "[d]efendant was convicted of second-degree aggravated assault in 1991 for engaging in a fight with his supervisor, Raymond Jimenez, and striking him with his fists, causing Jimenez' eyeglasses to lacerate Jimenez' eye.  The State admitted at trial and on direct appeal that Jimenez was hospitalized for two days but regained full vision within two months after the incident."  In light of our disposition, we need not develop how a judge would decide whether the proofs would warrant only a third degree conviction if the offense occurred today.

By *L.* 1995, *c.* 307, § 2, the Legislature adopted *N.J.S.A.* 2C:12–1(b)(7), which created a third degree aggravated assault for attempting to cause or causing "significant bodily injury purposely or knowingly or, under circumstances manifesting extreme indifference to the value of human life recklessly causes such significant bodily injury." "Significant bodily injury" is defined as "bodily injury which creates a temporary loss of the function of any bodily member or organ or temporary loss of any one of the five senses." *L.* 1995, *c.* 307, § 1; *N.J.S.A.* 2C:11–1(d).

Because the Code of Criminal Justice was designed to classify crimes by degree for purposes of sentencing, based in part on the loss or injury to the victim, the Legislature has now created a criminal offense for attempting to cause or causing less than the "[s]erious bodily injury," *N.J.S.A.* 2C:11–1(b), required for a second degree crime, but more than mere "bodily injury" which, unless a law enforcement or other public officer is involved, generally constitutes only non-indictable simple assault. *See* *N.J.S.A.* 2C:12–1(a), –1(b), –1(c), –1(d).[2] As a result, the jury would not have to choose between returning a guilty verdict on a second degree crime or acquitting defendant of an indictable offense. *See, e.g., State v. Sloane,* 217 *N.J.Super.* 417, 422–23, 526 *A.*2d 226 (App.Div.1987), *rev'd on other grounds,* 111 *N.J.* 293, 299, 544 *A.*2d 826 (1988); *see also State v. Powell,* 84 *N.J.* 305, 316–18, 419 *A.*2d 406 (1980).

The legislative history relating to the new crime includes the following statement by the Assembly Judiciary, Law and Public Safety Committee:

> The committee amended the bill to add a definition of "significant bodily injury" rather than changing the definition of "serious bodily injury". The committee amendments added a new category of aggravated assault that would be graded as a crime of the third degree that would read "attempts to cause significant bodily injury to another or causes significant bodily injury purposely or knowingly or,

---

[2] Simple assaults upon law enforcement officers and non-injurious assaults with weapons are classified as crimes based on the culpability of the defendant. *See N.J.S.A.* 2C:12–1.

under circumstances manifesting extreme indifference to the value of human life recklessly causes such significant bodily injury"....

The amendments are an attempt to address the problem of classifying certain types of assault which fall between simple assault and aggravated assaults where the victim suffers serious bodily injury. The approach of the bill in its original form to classify certain simple assaults as crimes of the fourth degree if serious bodily injury was suffered may have resulted in the jury finding this as a lesser included offense in many, if not all, aggravated assault cases. These amendments are intended to provide an intermediate level of assault which is more serious than simple assault and yet may not result in serious injury. An example of this intermediate type of assault would be a bar fight which erupts and in which one of the participants suffers a blow to the eye and which results in impaired vision for a few days but which does not result in permanent injury.

[Assembly Judiciary, Law and Public Safety Committee, *Statement to Senate, No. 504* [*L.* 1995, *c.* 307, § 2] (April 12, 1995); *see also* Cannel, *New Jersey Criminal Code Annotated,* comment 1 on *N.J.S.A.* 2C:12–1 (2000).]

Believing that he was convicted only of the new offense (which arguably includes an attempt to cause serious bodily injury in which only "significant bodily injury" results, heretofore exclusively a second degree crime), on or about January 11, 2000, defendant moved for reduction of sentence pursuant to *R.* 3:21–10(b)(4) which allows a change of sentence "as authorized by the Code of Criminal Justice." The trial judge denied the motion. Defendant appeals to us and argues that "the motion for reconsideration of sentence should have been granted."

*Rule* 3:21–10(b)(4) was adopted effective September 1, 1979, to implement the Code of Criminal Justice ("Code"), which became effective that day. The Code embodied *N.J.S.A.* 2C:1–1(d)(2) which permitted a defendant serving a sentence greater than the Code authorized maximum for an equivalent pre-Code offense, to move for re-sentencing under the Code. The new Rule accommodated that legislative desire and provisions of the Code authorizing the change or reduction of sentence. *See Part III of the Report of the Criminal Practice Committee,* 103 *N.J.L.J.* 413, 417 (1979).[3] Thus, the Rule permits the implementation of a legislative scheme authorizing a change or reduction of sentence, which would otherwise be prohibited by the strict time limits of *Rule* 3:21–10(a).

---

[3] The rule as adopted was not limited to specifically referenced Code sections.

*See generally, State v. Velez,* 119 *N.J.* 185, 574 *A.*2d 445 (1990); *State v. G.B.,* 255 *N.J.Super.* 340, 605 *A.*2d 269 (App.Div.1992); *State v. Robinson,* 198 *N.J.Super.* 602, 487 *A.*2d 1304 (Law Div.1984).[4]

The legislative history behind the Code, which has been in effect in New Jersey for twenty-two years, reveals that the Legislature fully understands how it can make a new more lenient sentencing provision applicable to pending offenses or convictions already entered. *See, e.g., N.J.S.A.* 2C:1–1(c), –1(d); *N.J.S.A.* 2C:35–23 (regarding sentences under the Comprehensive Drug Reform Act to prior offenses); *N.J.S.A.* 2C:43–6.3 (implementing Graves Act exception). Moreover, we deal here with a new offense, not with the reduced maximum sentence for an existing crime. *Compare Kendall v. Snedeker,* 219 *N.J.Super.* 283, 286–87, 530 *A.*2d 334 (App.Div.1987); *State v. Rock,* 228 *N.J.Super.* 577, 580, 550 *A.*2d 531 (Law Div.1988). And there is not the slightest suggestion in the legislative history we can find that the Legislature, which has adopted the aforementioned provisions of the Code to permit applications for initial sentencing or re-sentencing of defendants as if convicted under a new equivalent offense, intended such an approach in these circumstances.

There is no contention, nor could there validly be one, particularly at this late date, that the proofs were insufficient to sustain the second degree verdict. *See Sloane, supra.* In any event, we rejected such a contention on defendant's direct appeal. *Cf. R.* 3:22–5. Accordingly, there is no basis on which to review or reduce defendant's sentence for the second degree crime.

The order under review is affirmed.

---

4 The sentence imposed in this case applied to the crime at the time of offense and was not "illegal." It was therefore neither correctable at any time nor on post-conviction relief as an illegal sentence. *See R.* 3:21–12; *R.* 3:22–2.