**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3430-17T1
                A-4004-17T1

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

TROY LEEPER, a/k/a JOJO,
TOJO, JOE JOE LEEPER,
and TROY CREEPER,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

LEONARDO J. GRAULAU,

      Defendant-Appellant.

_____

Submitted March 30, 2020 –
Decided September 3, 2020

Before Judges Ostrer, Vernoia, and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment Nos. 17-03-0709, 17-07-1914, and 17-07-2060.

Richard Sparaco, attorney for appellant Troy Leeper.

Joseph E. Krakora, Public Defender, attorney for appellant Leonardo J. Graulau (Tamar Yael Lerer, Assistant Deputy Public Defender, of counsel and on the brief).

Jill S. Mayer, Acting Camden County Prosecutor, attorney for respondent (Nancy Philion Scharff, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief in A-3430-17; Maura Murphy Sullivan, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief in A-4004-17).

PER CURIAM

Defendants Troy Leeper and Leonardo J. Graulau were tried together before a jury and both were found guilty of aggravated assault and conspiracy to commit robbery. They separately appeal from their convictions and the sentences that were thereafter imposed by the judge who presided over the trial. We consolidate their back-to-back appeals for purposes of this opinion.

Each defendant raises several issues on appeal. Both challenge the trial court's decision to deny their motions for directed verdicts of acquittal at the close of the State's case-in-chief. After reviewing the record in view of the

arguments of counsel and the legal principles that apply, we affirm the trial court's decision to deny those motions. The State adduced ample evidence, including surveillance video of the assault, to support defendants' convictions for aggravated assault and conspiracy to commit robbery.

Defendant Leeper also claims for the first time on appeal that the trial court erred by allowing the State to introduce hearsay evidence. He also challenges the extended term of imprisonment that was imposed based on his status as a persistent offender. We reject those contentions. The admission of the hearsay evidence was not capable of producing an unjust result and therefore does not rise to the level of plain error. Nor did the trial court abuse its discretion when it sentenced Leeper to a fifteen-year term of imprisonment after finding that defendant was a persistent offender pursuant to N.J.S.A. 2C:44-3(a).

Defendant Graulau also claims the trial court erred (1) in denying his motion to suppress the incriminating statement he gave to police during a custodial interrogation, (2) in allowing a detective to testify as to a portion of the statement codefendant Leeper gave to police, and (3) in failing to account for Graulau's young age when determining the length of the prison term to impose. We reject those contentions as well. The record shows that Graulau voluntarily and knowingly waived his right to remain silent and to consult with

3

an attorney before answering questions. The portion of codefendant Leeper's statement that was communicated to the jury through the detective's testimony did not expressly incriminate Graulau and linked him to the criminal attack only though other evidence in the case. Accordingly, the admission of this testimony did not violate Graulau's right to confront the witnesses against him. Finally, the trial court did not abuse its sentencing discretion or impose a prison term that shocks the judicial conscience considering the brutality of Graulau's assault upon the victim and his history of juvenile adjudications of delinquency. We therefore affirm the convictions and sentences of both defendants.

## I.

A Camden County grand jury returned a three-count indictment charging Leeper and Graulau with (1) first-degree robbery, N.J.S.A. 2C:15-1(a)(1); (2) second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); and (3) second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2 and 2C:15-1(a)(1).

Graulau filed a Miranda[1] motion to suppress the statement he gave to police. After convening a hearing, the trial court held that the statement was voluntary and admissible.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-3430-17T1

Leeper and Graulau were tried together before a jury over the course of two days. After the State presented its case-in-chief, both defendants moved for a judgment of acquittal. The court denied the motion with respect to both defendants and all charges. The jury thereafter convicted both defendants of aggravated assault and conspiracy to commit robbery. The jury acquitted both defendants of the substantive robbery charge. The jury also acquitted both defendants of the lesser-included offense of theft.

Leeper was sentenced on the aggravated assault conviction to an extended term of imprisonment as a persistent offender pursuant to N.J.S.A. 2C:44-3(a). The trial judge imposed a state prison term of fifteen years subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. On the conspiracy to commit robbery conviction, the court sentenced Leeper to a concurrent state prison term of eight years subject to NERA.

Graulau was sentenced on the aggravated assault conviction to nine years in prison subject to NERA. On the conspiracy to commit robbery conviction, the court sentenced Graulau to a concurrent state prison term of seven years subject to NERA.

A-3430-17T1

Defendant Leeper presents the following contentions for our consideration:

POINT I

THE TRIAL COURT ERRED IN FAILING TO GRANT THE DEFENDANT'S MOTION FOR A DIRECTED FINDING OF NOT GUILTY OF CONSPIRACY AND/OR AGGRAVATED ASSAULT AT THE CONCLUSION OF THE STATE'S CASE-IN-CHIEF.

POINT II

DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO REPEATED ERRORS IN ALLOWING HEARSAY TESTIMONY TO BOLSTER THE TESTIMONY OF THE VICTIM AND THEREBY UNDULY PREJUDICING THE DEFENDANT.

POINT III

DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO THE ERROR IN ALLOWING INTO EVIDENCE OUT-OF-COURT PHOTOGRAPHIC IDENTIFICATION OF DEFENDANT THAT IMPROPERLY BOLSTERED THE VICTIM'S TESTIMONY WHILE HAVING NO PROBATIVE VALUE.

POINT IV

DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL WHEN THE DETECTIVE WAS

PERMITTED TO MAKE AN IN-COURT IDENTIFICATION OF THE DEFENDANT AS THE PERSON IN THE ONE PHOTOGRAPH THAT WAS SHOWN TO THE VICTIM AND WHOM THE VICTIM IDENTIFIED AS HIS ASSAILANT.

POINT V

THE COURT ABUSED ITS DISCRETION IN GRANTING THE STATE'S MOTION FOR AN EXTENDED TERM SENTENCE.

POINT VI

THE SENTENCE OF FIFTEEN YEARS WAS EXCESSIVE—THE COURT ERRED IN EVALUATING THE MITIGATING AND AGGRAVATING FACTORS.

Defendant Graulau presents the following contentions for our consideration:

POINT I

BECAUSE THE STATE DID NOT DEMONSTRATE BEYOND A REASONABLE DOUBT THAT THE DEFENDANT UNDERSTOOD WHAT IT MEANT TO WAIVE HIS RIGHTS, THE SUBSEQUENT STATEMENT MUST BE SUPPRESSED.

POINT II

BECAUSE THE STATE PRESENTED NO EVIDENCE OF AN AGREEMENT TO ROB THE VICTIM, THE JUDGMENT OF ACQUITTAL

7

SHOULD HAVE BEEN GRANTED ON CONSPIRACY TO COMMIT ROBBERY.

POINT III

THE ADMISSION OF THE NON-TESTIFYING CO-DEFENDANT'S STATEMENT WAS UNLAWFUL AND NECESSITATES REVERSAL OF DEFENDANT'S CONVICTIONS.

POINT IV

THE TRIAL COURT'S FAILURE TO PROPERLY TAKE INTO ACCOUNT DEFENDANT'S YOUNG AGE RESULTED IN AN EXCESSIVE SENTENCE.

III.

Because both defendants appeal from the denial of a motion for acquittal, we recount the evidence adduced by the State at trial in some detail. The victim testified that he was confronted by Leeper as he exited a convenience store in the City of Camden. The victim was familiar with Leeper and knew him by the name "Jo-Jo." The two were discussing a prior verbal altercation between them when other members of Leeper's "crew"[2] approached.

The victim identified Graulau as one of the members of the group that accosted him. Leeper, Graulau, and the others formed a circle around the victim

---

[2] Video footage of the group shows the victim was surrounded by six or seven people.

to prevent him from escaping. Graulau told the victim, "[I]f you run or you move, I'm gonna knock you the fuck out." The group then walked to Division Street. The victim testified he was being led by Leeper, who was holding him by the neck.

At one point, Leeper asked one of the members of the group, "[is] this the guy right here?" He then asked the victim, "tell me what you said?" The victim responded, "I ain't say nothing." The victim was then struck in the head from behind, causing him to collapse. The group stomped, kicked, and punched the victim in the head while screaming at him, "you lying, you lying, you lying."

Leeper pulled the victim up from the pavement and led him by the neck into an alleyway. The victim testified that Graulau and a "third guy" were also in the alley.[3] The victim testified that Graulau said, "run [the victim's] pockets." The victim testified they stole $160, his bicycle, and his cell phone. The victim testified Leeper was the person who took the money from his pockets. The next thing the victim remembered was encountering a police officer on the street. Much of the victim's account concerning the initial confrontation was corroborated by surveillance video that was played to the jury.

---

[3] The third assailant was identified as defendant Graulau's brother, N.G. N.G. was a juvenile at the time of the incident.

A-3430-17T1

Officers Sean Hunter and Daniel Fiori were dispatched to Division Street in response to a 911 call reporting a fight in the area. Officer Fiori located the victim a block away in the area of 7th and Spruce streets. The officer's attention was drawn to a large contusion on the victim's head. The jury was shown footage taken from Officer Fiori's body-worn camera that shows the swelling and laceration. Officer Fiori testified that the victim was staggering and kept looking over his shoulder towards the alley. Officer Hunter next arrived on the scene and observed the victim "visibly shaking" with a large welt on his head and bleeding from his face.

In response to questioning from Officer Fiori, the victim said that "Jo-Jo and the boys jumped him." He also told Officer Fiori that the assailants had taken money and a phone from him.

The victim was taken to Cooper Hospital for medical treatment. He was diagnosed with a hematoma and abrasions to the face. Before being discharged from the hospital, the victim gave a recorded statement to Detective Michael McFetridge. The victim stated that "Jo-Jo" was with two Hispanic males and one black male. He was unable to provide names for the two Hispanic males. He also said the group assaulted and robbed him, taking $160, a cell phone, and his bicycle.

The victim later gave a second recorded statement to the detective. His account of Leeper's role in the incident was different from the one he had provided in his initial statement. In the statement he had given at the hospital, the victim told Detective McFetridge that Leeper was trying to defuse the situation as it escalated to violence. He did not tell Detective McFetridge that Leeper punched, kicked, or stomped him, or that Leeper robbed him. In the second recorded statement, after he was shown footage from the surveillance video, the victim told the detective that Leeper had led him into an "ambush." In an unrecorded third interview given on May 10, 2017, the victim provided additional information and identified Leeper, Graulau, and N.G. from photo arrays that were shown to him.

On May 17, 2017, Graulau was taken into custody and gave an electronically recorded statement to Detective McFetridge. Graulau initially denied having any part in the incident. After being shown the surveillance video recording, however, he admitted to assaulting the victim in the presence of N.G. and Leeper. He denied taking anything from the victim.

IV.

We first address the issue that both defendants raise on appeal, whether the trial court erred by denying their motion for a directed verdict of acquittal at

the conclusion of the State's case-in-chief. We begin our analysis by acknowledging the legal principles that govern the nature and standard of our review. In considering a motion for acquittal,

> the question the trial judge must determine is whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> [State v. Reyes, 50 N.J. 454, 458–59 (1967) (citing State v. Fiorello, 36 N.J. 80, 90–91 (1961)).]

On appeal of a court's denial of a motion for judgment of acquittal, we apply the same standard as the trial court in reviewing an order denying a motion for a judgment of acquittal. State v. Fuqua, 234 N.J. 583, 590 (2018) (citing State v. Sugar, 240 N.J. Super. 148, 153 (App. Div. 1990)).

## A.

We first address defendant Leeper's argument with respect to the charge of aggravated assault. He claims the State failed to prove that the victim sustained sufficient injury to warrant a conviction for aggravated assault. He further asserts the evidence of his involvement in the attack was too weak to justify his conviction for assault, noting that the victim was initially under the

impression that Leeper had nothing to do with the assault and had actually tried to defuse the situation.

Leeper argues he was entitled to a directed verdict of acquittal because the State failed to prove that the victim sustained serious bodily injury. The term "serious bodily injury" is defined in N.J.S.A. 2C:11-1(b) as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." Serious bodily injury is thus distinguished from bodily injury, which "means physical pain, illness or any impairment of physical condition." N.J.S.A. 2C:11-1(a). The Legislature has also defined an intermediate level of injury, "significant bodily injury," as "bodily injury which creates a temporary loss of the function of any bodily member or organ or temporary loss of any one of the five senses." N.J.S.A. 2C:11-1(d).

Leeper's argument concerning the degree of injury is based on an incomplete and thus erroneous interpretation of the aggravated assault offense codified in N.J.S.A. 2C:12-1(b)(1). The statute makes clear that the State may prove that an aggravated assault was committed even where the degree of injury that was actually sustained by a victim does not rise to the level of serious bodily injury. A jury may find that a defendant committed an aggravated assault under

N.J.S.A. 2C:12-1(b)(1) using an alternative method. The statute provides that a person is guilty of aggravated assault if he "[a]ttempts to cause serious bodily injury to another, or causes such injury purposely or knowingly . . . ." (emphasis added). It thus is clear that "[a]n attempt to cause [serious bodily injury] is sufficient to convict." State v. Mingo, 263 N.J. Super. 296, 305 (App. Div. 1992) (D'Annunzio, J., dissenting), rev'd, 132 N.J. 75 (1993) (reversing judgment substantially for reasons expressed by the dissent).

It may be true that, fortuitously, the victim did not sustain serious bodily injury from the attack.[4] In view of the alternate means for proving an aggravated assault, however, we need not characterize the level of injury the victim actually suffered by reference to the different gradations of bodily injury defined in N.J.S.A. 2C:11-1. The trial court aptly recognized, in this regard, that the resolution of defendants' motion for judgment of acquittal hinged on whether

---

[4] The State did not present expert testimony that the head injuries the victim sustained created a substantial risk of death. Those injuries, consisting of a large hematoma and abrasions to the face and head, may be more consistent with bodily injury than serious bodily injury. See State ex rel. T.S., 413 N.J. Super. 540, 542–43 (App. Div. 2010) (affirming a conviction for delinquency based on simple assault after the defendant inflicted bodily injury by hitting the victim in her "blind side" and striking her while she lay on the ground, ultimately causing lacerations and bruises). Relatedly, the victim's disorientation after the assault as described by the responding officers may be more consistent with a temporary loss of senses that would constitute significant bodily injury rather than serious bodily injury.

the State had presented sufficient evidence to show there had been an attempt to inflict serious bodily injury. The court reasoned:

> [T]he attempt aspect is really the focus that I think the jury has to look at in this case. There was testimony that [the victim] said he was being stomped and assaulted. The video that was played for the jury reflects that he was being kicked while he was in a prone position . . . . Officer Fiori testified that when he first saw him he had a welt the size of a softball on his head. The conduct certainly reflects an attempt to cause serious bodily injury. There's no other justification for kicking someone while they're prone and on the ground . . . . [A]ccordingly, the application to dismiss that count will . . . be denied.

Our de novo review of the evidence presented by the State amply supports the trial court's conclusion that a reasonable jury could find that the members of the group attempted to cause serious bodily injury when they collectively attacked the victim. A person attempts to commit a crime when, "acting with the kind of culpability otherwise required for commission of the crime, he . . . does . . . anything with the purpose of causing such result." N.J.S.A. 2C:5-1(a)(2). The surveillance video played to the jury clearly shows the victim being stomped, kicked, and punched by several persons, including Graulau. The victim's skull was driven into the pavement while he was helpless and in a fetal position. This vicious assault clearly placed the victim at risk of a serious brain injury or a fractured skull, either of which could have resulted in "protracted

15

loss or impairment of the function of [an] . . . organ" or worse. N.J.S.A. 2C:11-1(b). Therefore, while the victim fortuitously might not have sustained serious bodily injury, the record amply supports the trial court's determination that a reasonable jury could conclude that the members of the group attempted to cause serious bodily injury to the victim, thereby satisfying the requirements of N.J.S.A. 2C:12-1(b)(1).

As we have noted, the surveillance video clearly shows that Graulau brutally struck and kicked the victim. Furthermore, Graulau admitted to beating the victim in his electronically recorded confession. In contrast, the State did not present evidence that Leeper struck the victim, although there was evidence that Leeper led the victim by the neck into the alleyway where the beating continued and the alleged robbery occurred. It remains for us to decide whether a reasonable jury could find that Leeper acted as an accomplice in the assault. See N.J.S.A. 2C:2-6(b)(3) (holding accountable a person "for the conduct of another person when . . . [h]e is an accomplice of such other person in the commission of an offense").

Giving the State the benefit of its favorable testimony and all permissible favorable inferences, Reyes, 50 N.J. at 458–59, a reasonable jury could find that Leeper aided and abetted the assault. The questions Leeper posed to other

members of the group and to the victim support the inference that this was a premeditated confrontation targeting the victim and that Leeper played a significant role in effectuating what amounted to an ambush. Leeper's direct physical acts directed against the victim, moreover, such as leading the victim by the neck to the alley, further support the conclusion that Leeper aided and abetted the attack even if he did not personally strike the victim.

We likewise reject Leeper's argument that the evidence was insufficient because the victim's initial statement to police indicated that Leeper had tried to defuse the situation rather than encourage escalation to physical violence. As we have noted, under the Reyes standard, we are required not only to give the State the benefit of all reasonable inferences but also to view the State's evidence in its entirety. Reyes, 50 N.J. at 458–59. It is of no moment that a portion of the State's evidence—the victim's initial statement to police—might support an exculpatory inference when viewed in isolation. In view of all the State's proofs that we have already recounted, a jury could reasonably conclude that Leeper was part of a planned ambush that was intended to cause serious bodily injury notwithstanding that the victim initially told police that Leeper had tried to defuse the situation. Accordingly, the trial court properly denied Leeper's motion for a directed verdict on the aggravated assault count.

A-3430-17T1

B.

We turn next to defendants' contention the trial court erred in denying their motion for a judgment of acquittal for the offense of conspiracy to commit robbery. Defendants argue that the State's evidence only established that they were present at the scene of the assault. Such a showing, they maintain, was insufficient to prove that they had entered into an agreement to rob the victim. Defendants note that neither of them admitted to robbing the victim, and that the victim appeared to equivocate on whether he was robbed on cross-examination. Even if a robbery occurred, they argue, the evidence only shows that they acquiesced or approved of the robbery, not that they entered into an agreement to participate in the robbery as would be necessary prove conspiracy. See State v. Carbone, 10 N.J. 329, 336–37 (1952) (requiring an agreement to support a charge of conspiracy).

We disagree. We conclude, as did the trial court, a reasonable jury could infer from the State's proofs that there had been an agreement to ambush the victim, assault him, and take money and property from him in the course of committing the planned attack.

As made clear in the plain language of the conspiracy statute, N.J.S.A. 2C:5-2(a), the State must prove there was an agreement to commit a specific

crime. State v. Samuels, 189 N.J. 236, 245 (2007). "The mere knowledge, acquiescence, or approval of the substantive offense, without an agreement to cooperate, is not enough to establish [that] one [i]s a participant in a conspiracy." State v. Abrams, 256 N.J. Super. 390, 401 (App. Div. 1992) (citation omitted). Rather, "[t]here must be intentional participation in the activity with a goal of furthering the common purpose; mere association is inadequate." Ibid. (citation omitted).

The law is also clear, however, that the State is not required to show direct evidence of the agreement such as a statement by co-conspirators manifesting an express agreement to commit a crime. See State v. Kamienski, 254 N.J. Super. 75, 94 (App. Div. 1992) (stating that "[a]n implicit or tacit agreement may be inferred from the facts and circumstances" (citations omitted)). Rather, "[b]ecause the conduct and words of co-conspirators is generally shrouded in 'silence, furtiveness and secrecy,' the conspiracy may be proven circumstantially." Samuels, 189 N.J. at 246 (quoting State v. Phelps, 96 N.J. 500, 509 (1984)). Whether circumstantial evidence establishes an agreement is a "question . . . of logic and common sense." Ibid. (quoting State v. Powell, 84 N.J. 305, 314 (1980)). "When 'each of the interconnected inferences [necessary to support a finding of guilt beyond a reasonable doubt] is reasonable on the

19

evidence as a whole,' judgment of acquittal is not warranted." Ibid. (alteration in original) (citations omitted).

Applying these principles to the proofs presented by the State in this case, we conclude a jury could reasonably infer that there was an implicit or tacit agreement to commit robbery. The first step in the logical sequence of inferences leading to this conclusion is that the circumstances of the violent confrontation suggest it was planned. The jury was free to conclude, in other words, that the appearance of Graulau and others who surrounded the victim while he was talking to Leeper was not mere happenstance. The inference that the encounter was planned, in turn, supports the interconnected inference that there was an agreement among the participants not just to intercept the victim, but also to attack him based on some past transgression.[5] Relatedly, the circumstances of the planned confrontation support the inference that the agreement was not just to assault the victim but also to take property from him, thereby inflicting economic and not just physical harm and underscoring the assailants' power and control over him.

---

[5] The State presented testimony that Leeper asked one of the members of the group, "is this the guy right here?" Leeper then asked the victim, "tell me what you said?" These questions suggest that the victim had not been targeted for attack at random, but rather was targeted based on an earlier interaction prompting some form of reprisal.

Graulau's reliance on our decision in <u>Abrams</u> is misplaced.  In <u>Abrams</u>, we determined there was insufficient evidence to support defendant's conviction for conspiracy to murder his paramour's husband.  <u>Id.</u> at 401.  The State's conspiracy theory depended upon the defendant's recorded statement in which he recounted his discussions with the victim's spouse concerning her "wish" for her husband's death.  <u>Id.</u> at 309.  We concluded that at no point in any of the conversations between defendant and the victim's wife did she ever "agree," either expressly or by implication, to any plan specifically proposed to kill her husband.  <u>Id.</u> at 400–01.  In fact, Abrams related in his statement that the victim's wife had told him it was not a good idea for him to kill her husband and that he should go on his with his life.  <u>Id.</u> at 400.

The facts presented in this case are quite different.  The circumstances of the group ambush suggest premeditation, planning, coordination, and reprisal.  Applying logic and common sense to the circumstances of the premeditated group encounter, <u>Samuels</u>, 189 N.J. at 246, it was reasonable for a jury to infer that there was at least an implicit agreement among the participants to intercept, isolate, assault, and rob the victim.  The State, moreover, produced ample evidence of both defendants' respective roles in the encounter from which a reasonable jury could conclude that Leeper and Graulau were parties to that

21

agreement. Accordingly, the trial court properly denied defendants' motions for a directed verdict of acquittal on the conspiracy count.

## V.

## A.

We turn next to the issues raised separately by each defendant. We begin with Leeper's contention that the State improperly introduced various forms of inadmissible hearsay testimony. Leeper argues for the first time on appeal that two detectives were permitted to testify about statements given to them by the victim, thereby improperly bolstering the victim's credibility. Specifically, Leeper claims Detective Fiori should not have been allowed to testify that the victim told him "Jo-Jo" and the boys had assaulted and robbed him and should not have been permitted to testify as to the victim's description of the assailants and what they were wearing.

Leeper further contends that Detective McFetridge should not have been permitted to testify that the victim told him he had been "assaulted and robbed . . . of approximately $160 in cash and an LG cell phone, and a bicycle." Defendant also contends that Detective McFetridge should not have been allowed to testify as to the victim's description of Jo-Jo or to relate to the jury that the victim told the detective he and Jo-Jo were acquainted.

A-3430-17T1

We reject all of these contentions. We note, first, that some of the statements Leeper points to are not inadmissible hearsay because they relate to the victim's identification of defendant. For example, the victim's statement providing the name "Jo-Jo" and his descriptions of the assailants would appear to be admissible under N.J.R.E. 803(a)(3). See State v. Johnson, 216 N.J. Super. 588, 601–02 (App. Div. 1987) (permitting out-of-court descriptions given by witnesses to police officers).

We nonetheless acknowledge that some of the statements attributed to the victim and communicated to the jury through the testimony of Detectives Fiori and McFetridge do not fall within a recognized exception to the general rule that prohibits the admission of hearsay statements. See State v. Sinclair, 49 N.J. 525, 536, 547 (1967) (holding that it was error to admit testimony that a victim said, "He is the one that robbed me, robbed us").

It bears repeating that Leeper did not object to this testimony. We view the failure to interpose a timely objection as "strong evidence that the error belatedly raised here was actually of no moment." State v. Tierney, 356 N.J. Super. 468, 481 (App. Div. 2003) (quoting State v. White, 326 N.J. Super. 304, 315 (App. Div. 1999)). Because defendant did not object at trial, moreover, he is required to show under the plain error doctrine that the testimony had the clear

capacity to produce an unjust result. R. 2:10-2. "For a hearsay error to mandate reversal, '[t]he possibility of [an unjust verdict] must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Neno v. Clinton, 167 N.J. 573, 586 (2001) (alterations in original) (quoting State v. Hightower, 120 N.J. 378, 410 (1990)).

Our review of the record as a whole convinces us that defendant was not denied a fair trial by the admission of these hearsay statements and thus has not established the basis for overturning the verdict under Rule 2:10-2. The belatedly challenged testimony relates to whether the victim was assaulted and robbed, who assaulted and robbed him, what the assailants looked like, what they were wearing, and what items were taken from the victim. The State presented ample non-hearsay evidence concerning each of these facets of the case. Notably, the confrontation was recorded on surveillance video and Leeper does not dispute that he was present at the scene. The victim was familiar with Leeper from prior interactions. Furthermore, the victim testified and was subjected to extensive cross-examination. In view of the admissible evidence that was presented at trial, the hearsay statements that were introduced without objection did not have the capacity to produce an unjust result. R. 2:10-2.

Leeper next argues that he was denied a fair trial by Detective McFetridge's testimony concerning the victim's out-of-court photo identification. Detective McFetridge testified that he showed the victim a photo array that included a photograph of Leeper. The detective testified that the victim positively identified Leeper as being involved in the incident. Leeper contends for the first time on appeal that this testimony was inadmissible hearsay and was also inadmissible because its probative value was significantly outweighed by the risk of undue prejudice. N.J.R.E. 802; N.J.R.E. 403.

These contentions lack sufficient merit to warrant extensive discussion. R. 2:11-3(e)(2). The use of a photo array to confirm Leeper's identity as Jo-Jo was permissible. State v. Farrow, 61 N.J. 434, 453 (1972) (permitting a witness to confirm an identification of a defendant from a single photo shown to the witness by law enforcement in order "to add [a] full name to a nickname"). The testimony concerning the out-of-court identification was not inadmissible hearsay. N.J.R.E. 803(a)(3). But even were we to assume that it was improper for the detective to relate that the victim had positively identified Leeper, that error would not rise to the level of plain error given that Leeper's presence at the scene of the attack was not in dispute.

Relatedly, this testimony was not unduly prejudicial under N.J.R.E. 403 as defendant now claims considering that Leeper and the victim knew each other from past interactions and especially considering that Leeper did not deny that he was present at the time of the assault. In these circumstances, we interpret the failure to object to the identification testimony as strong evidence that counsel recognized that these hearsay statements were inconsequential. Tierney, 365 N.J. Super. at 481.

Additionally, Leeper for the first time on appeal challenges Detective McFetridge's in-court identification of him as the person in the photograph shown to the victim during the out-of-court identification procedure. Leeper contends this testimony was inadmissible under N.J.R.E. 403 because it gave "further credibility to the victim's testimony by having a law enforcement detective point to the defendant and identify him to the jury." This contention lacks sufficient merit to warrant all but brief discussion. R. 2:11-3(e)(2). As noted, defendant's presence at the scene of the crime was not in dispute. The detective's in-court identification of defendant as the person depicted in the photograph selected by the victim, while improper, did not have the clear capacity to produce an unjust result. R. 2:10-2.

VI.

We next address Leeper's contentions relating to his sentence.  He  argues: (1) the trial court abused its discretion in granting the State's motion to sentence him to an extended term as a persistent offender pursuant to N.J.S.A. 2C:44-3(a); (2) the trial court impermissibly double-counted his prior convictions, considering them both as a predicate for finding defendant to be a persistent offender and as a basis for finding aggravating factors; and (3) the court abused its discretion in applying and weighing the aggravating and mitigating factors, resulting in imposition of an excessive sentence.

A.

Defendant acknowledges that his criminal record makes him eligible for a discretionary extended term as a persistent offender under N.J.S.A. 2C:44-3(a).[6]  He nonetheless maintains that his role in the assault does not warrant an

---

[6] N.J.S.A. 2C:44-3(a) provides:

> A persistent offender is a person who at the time of the commission of the crime is 21 years of age or over, who has previously been convicted on at least two separate occasions of two crimes, committed at different times, when he was at least 18 years if age, if the latest of these crimes or the date of the defendant's last release from confinement, whichever is later, is within 10 years of

A-3430-17T1

enhanced sentence and that he should instead have been sentenced within the ordinary range of sentences that applies to the second-degree crimes for which he was convicted. He contends nothing was unusual about the crime such that an extended-term sentence was warranted, especially given that defendant himself "took no active role in the assault upon [the victim]." Nor were any weapons used in the assault.[7] Viewed in that light, defendant asserts that an extended term of imprisonment was not necessary to ensure the "protection of the public," which, he argues, is a required finding before the persistent offender extended term may be imposed.

---

the date of the crime for which the defendant is being sentenced.

[7] Defendant's argument is in tension with the notion that the consequences of a conviction are the same whether a defendant is a principal or accomplice. Cf. State v. Rumblin, 166 N.J. 550, 557 (2001) (applying NERA to unarmed accomplices of principals who commit first-degree armed robbery and other crimes); State v. White, 166 N.J. 550, 130 (1984) (applying the sentencing provisions of the Graves Act, N.J.S.A. 2C:43-6(c), to accomplices who did not use or possesses firearms because "[o]ne is the alter ego of the other"). On the facts presented to us in this case, we deem defendant to be culpable for the consequences of the victim's ambush and beating.

Defendant relies on State v. Dunbar, 108 N.J. 80 (1987), and State v. Pierce, 188 N.J. 155 (2006), for that proposition.[8]  In presenting this argument, however, Leeper misconstrues the Supreme Court's holding in Pierce.  The Court in that case addressed the unanticipated Apprendi consequences of its earlier ruling in Dunbar and concluded that a finding that a defendant meets the statutory criteria for persistent-offender status based on the defendant's prior criminal record raises the maximum sentence for Apprendi purposes to the top of the extended-term range.  188 N.J. at 169.  The Court added:

> Where, within that range of sentences, the court chooses to sentence a defendant remains in the sound judgment of the court—subject to reasonableness and the existence of credible evidence in the record to support the court's finding of aggravating and mitigating factors and the court's weighing and balancing of those factors found.
>
> [Ibid.]

---

[8]  Defendant appears to argue that this finding violates Sixth Amendment principles set forth in Apprendi v. New Jersey, 530 U.S. 466, 489 (2000) (proscribing judicial factfinding "that increases the penalty for a crime beyond the prescribed statutory maximum" penalty "[o]ther than the fact of a prior conviction").  The New Jersey Supreme Court in Pierce considered and rejected that argument, holding that a sentencing court's consideration of the need to protect the public is made only after the court concludes that the defendant is eligible for an enhanced sentence as a persistent offender by reason of his record of prior convictions.  188 N.J. at 168.

A-3430-17T1

Furthermore, and directly contrary to defendant's present argument, the Court clarified that "Dunbar's reference to a finding of 'need to protect the public' is not a precondition to a defendant's eligibility for sentencing up to the top of the discretionary extended-term range." Id. at 170 (emphasis added). Rather, "[t]he court may consider the protection of the public when assessing the appropriate length of a defendant's base term as part of the court's finding and weighing of aggravating factors and mitigating factors." Ibid. (emphasis added).

We would add that the Court in Dunbar recognized that protection of the public is a concept rooted in deterrence. The Court reasoned, "[p]rimarily, 'the adequate protection of society' standard encompasses the doctrine of deterrence—the protection of society from future offenses by the defendant and others through punishment." 108 N.J. at 91(citing State ex rel. C.A.H. & B.A.R., 89 N.J. 326, 337 (1982)).

Aggravating factor nine specifically addresses the "need for deterring the defendant and others from violating the law." N.J.S.A. 2C:44-1(a)(9). The sentencing court properly found that aggravating factor nine applied in this case. Thus, in accordance with the analytical framework explained in Pierce, the sentencing court in this case assessed and accounted for the need to protect the

public when it found aggravating factor nine.  In sum, we believe the sentencing court made all the required findings and properly imposed an extended term under N.J.S.A. 2C:44-3(a).

## B.

Leeper contends the trial court impermissibly double-counted the convictions that made him eligible for an extended term by also relying on those convictions in finding aggravating factors three (the risk that defendant will commit another offense) and six (extent of criminal record).  N.J.S.A. 2C:44-1(a)(3), (6).  The record does not support defendant's claim.

We agree that it would be improper for a sentencing court to consider a prior conviction both as a predicate offense for purposes of the persistent offender extended term statute, N.J.S.A. 2C:44-3(a), and as a basis for finding an aggravating factor under N.J.S.A. 2C:44-1(a). See State v. Vasquez, 374 N.J. Super. 252, 267 (App. Div. 2005) (concluding that it was impermissible double-counting for the court to raise the presumptive extended base term of defendant's sentence on account of defendant's prior conviction, which was the conviction requiring a mandatory extended term sentence); Cf. State v. Miller, 108 N.J. 112, 122 (1987) ("[F]actors invoked by the Legislature to establish the degree of the crime should not be double counted when calculating the length of the

31

sentence."). We do not agree, however, that such double counting occurred in this case.

As noted, the persistent offender statute requires only two prior convictions. See supra note 6. Leeper has four qualifying adult convictions: three Superior Court convictions and a federal felony conviction.[9] Accordingly, the sentencing court was free to consider the two extra convictions for purposes of finding aggravating factors three and six without running afoul of the double counting prohibition.

We recognize the sentencing court did not specify which of defendant's prior convictions it was relying on to establish that defendant was a persistent offender, and which ones the court relied on to find aggravating factors three

---

[9] Defendant's history of Superior Court convictions includes (1) a conviction in June 2006 for possession of a controlled dangerous substance (CDS) with intent to distribute within 1,000 feet of a school zone, in violation of N.J.S.A. 2C:35-7; (2) a conviction in April 2008 for possession of CDS, in violation of N.J.S.A. 2C:35-10(a)(1); and (3) a conviction in August 2016 for witness tampering, in violation of N.J.S.A. 2C:28-5(a)(1). Defendant was convicted in federal court on November 10, 2008, for possession of a firearm by a convicted felon.

Regarding defendant's federal conviction, we note N.J.S.A. 2C:44-4(c) provides that the term prior conviction includes felony convictions in another jurisdiction if a term of imprisonment in excess of six months was authorized. This definition applies to the persistent offender extended term statute. See State v. Copeman, 197 N.J. Super. 261, 265 (App. Div. 1984) ("A conviction in another jurisdiction can support a discretionary imposition of an extended term."). Defendant received a fifty-five-month term of imprisonment for his federal conviction.

and six.  The record nonetheless shows that the court was well aware of the prohibition against double counting defendant's prior convictions.  In its sentencing memoranda, the State cautioned the trial court not to double count the convictions used to establish defendant's extended-term eligibility as a persistent offender when assessing the applicable aggravating factors.  Furthermore, the prosecutor at the sentencing hearing reiterated that it would be inappropriate for "the court to double count the two [prior convictions] that it had used to grant the persistent offender, extended term application."  Just before announcing the sentence, the court referenced the prosecutor's allocution, noting, "[i]n determining the appropriate sentence, the court considered . . . the recommendations of the prosecutor."

In these circumstances, Leeper has failed to establish that the trial judge ignored the prosecutor's warning and impermissibly double-counted the prior convictions.  While it would have been preferable for the trial court to have specified how each prior conviction was used in the sentencing calculus, we believe it would be pointless to remand the case for the court to expressly state on the record that it complied with the rule prohibiting double counting that was discussed at the sentencing hearing.

## C.

Finally, we reach Leeper's argument that the court imposed an excessive sentence that shocks the judicial conscience. Leeper contends the sentencing court erred in declining to find mitigating factor one (defendant's conduct neither caused nor threatened serious harm), N.J.S.A. 2C:44-1(a)(1). He also claims the court abused its discretion in weighing the aggravating and mitigating factors. He asserts that a proper assessment should have resulted in a five-year term of imprisonment, rather than the fifteen-year sentence that was imposed. Our review of the record leads us to conclude that the trial judge conducted a thorough and cogent analysis of the relevant circumstances pertaining both to the offense and defendant's personal background. We therefore affirm the fifteen-year prison term.

Sentencing determinations are entitled to deference. State v. Fuentes, 217 N.J. 57, 70 (2014). Appellate courts are not to substitute their judgment for the trial court's judgment simply because the appellate court would have reached a different result. State v. Lawless, 214 N.J. 594, 606 (2013) (citations omitted).

> The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the

sentence clearly unreasonable so as to shock the judicial conscience."

[Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364–65 (1984)).]

In this case, the judge's assessment of the relevant circumstances led him to find aggravating factors three (the risk that defendant will commit another offense); six (extent of criminal record); and nine (need to deter). N.J.S.A. 2C:44-1(a)(3), (6), (9).[10] The court considered but ultimately rejected Leeper's argument for mitigating factors one (defendant's conduct did not cause or threaten serious harm); eight (defendant's conduct was the result of circumstances unlikely to recur); nine (defendant's character and attitude indicate he is unlikely to commit another offense); eleven (imprisonment would entail excessive hardship to defendant or his dependents); and twelve (willingness of defendant to cooperate with law enforcement). N.J.S.A. 2C:44-1(b)(1), (8), (9), (11), (12).

---

[10] The court rejected aggravating factors one (nature and circumstances of the offense), and two (gravity of the harm to the victim). N.J.S.A. 2C:44-1(a)(1), (2). The court reasoned these factors were "calculated" into the second-degree aggravated assault conviction.

As noted, Leeper now challenges the sentencing court's decision to reject mitigating factor one, which applies when "[t]he defendant's conduct neither caused nor threatened serious harm." (emphasis added). The court reasoned that Leeper "led the victim to the slaughter."[11] We note the sentencing judge presided over the trial and thus was intimately familiar with the evidence pertaining to defendant's role and culpability. We agree with the trial court that Leeper's conduct threatened serious harm to the victim and thus conclude there was ample basis for finding aggravating factor one.

In all other respects, moreover, the sentence imposed was based on sufficient credible evidence, was reasonable, and does not shock the judicial conscience. Roth, 95 N.J. at 364–65. Leeper has an extensive criminal record consisting of three Superior Court convictions, a federal conviction, three municipal court convictions, and multiple juvenile adjudications of delinquency. See supra note 9. In view of the seriousness of the offense and defendant's personal background, the imposition of a fifteen-year sentence subject to NERA was appropriate and by no means constitutes an abuse of sentencing discretion.

---

[11] The State's evidence showed that Leeper led the victim by the neck to the location where he was beaten, stomped, and kicked in the head.

A-3430-17T1

To the extent we have not already addressed them, any other arguments raised by Leeper lack sufficient merit to warrant discussion in this written opinion. R. 2:11-3(e)(2). We turn then to the issues raised by defendant Graulau.

VII.

Graulau challenges the trial court's decision to deny his motion to suppress the electronically recorded statement he gave to Detective McFetridge during a stationhouse interrogation. Graulau contends that he did not understand what it means to "waive" constitutional rights and therefore did not relinquish those rights knowingly. He further contends that even if his statement were admissible, the trial court erred by not sua sponte highlighting to the jury that during the waiver colloquy with Detective McFetridge, Graulau initially indicated that he did not understand his rights. Graulau maintains the failure to instruct the jury on this point had the capacity to mislead the jury and produce an unjust result.[12]

---

[12] Graulau did not request the trial court to give this jury instruction. Accordingly, we review this aspect of his first point on appeal under the plain error standard. R. 2:10-2.

We reject both of these contentions relating to his confession. Graulau voluntarily and knowingly relinquished his <u>Miranda</u> rights. Furthermore, there was no basis for the jury instruction he now claims should have been given.

We begin our analysis by noting that when reviewing the denial of a motion to suppress a statement, we apply a deferential standard of review to the trial court's findings of fact. <u>State v. S.S.</u>, 229 N.J. 360, 379 (2017). We accept the motion court's factual findings unless they are not supported by sufficient credible evidence in the record. <u>Id.</u> at 381 (citing <u>State v. Gamble</u>, 218 N.J. 412, 424 (2014)). In contrast, we review the motion court's legal conclusions de novo. <u>Id.</u> at 380.

Graulau's stationhouse custodial interrogation was electronically recorded in accordance with <u>Rule</u> 3:17. The trial court thus had the benefit of knowing exactly what defendant was told and what defendant said and did before he admitted to his role in the beating of the victim. <u>See</u> <u>State v. A.M.</u>, 237 N.J. 384, 401 (2019) (noting "that by videotaping their questioning of defendant, police permitted the trial court to review the interview, and assess defendant's overall deportment and conduct as well as the officers' demeanor and conduct throughout the custodial interrogation").

In order to address Leeper's contention that he did not knowingly waive his <u>Miranda</u> rights, we recount in detail what transpired during the course of the waiver portion of the interrogation. After discussing Graulau's background and obtaining basic information, Detective McFetridge informed Graulau of the purpose of the interrogation. The detective informed Graulau that he was charged with robbery, conspiracy to commit robbery, and aggravated assault, and that he was brought in to "get [his] side of the story."

Graulau inquired why a warrant had been issued against him. McFetridge explained that he first had "to make sure that [Graulau] understood [his] rights." Graulau replied, "Yeah, I have the right to remain silent . . . . I know all that. You good. Come on." McFetridge reiterated that he was obligated to explain defendant's rights.

McFetridge proceeded to advise Graulau of his <u>Miranda</u> rights, reading them from the standard rights form utilized by law enforcement. <u>See</u> <u>A.M.</u>, 237 N.J. at 400 (deeming it a "better practice . . . to read the entire <u>Miranda</u> rights form aloud to a suspect being interrogated"). After reciting the <u>Miranda</u> rights, Detective McFetridge asked Graulau whether he "desire[d] to waive those rights to answer questions or give a statement?" Defendant Graulau responded, "What?" The following colloquy occurred:

Detective McFetridge: Now that you —

Defendant: If I'm a answer your questions or not, that's what you saying?

Detective McFetridge: Right.

Defendant: Do I wanna talk to you? Yeah, come on. Let's talk. Yeah. Come on.

Detective McFetridge: All right. So the date—

Defendant: It was just too many big words in that one.

Detective McFetridge: I feel you. But you understand—

Defendant: Yeah, I understand it.

Detective McFetridge: Everything (indiscernible)—

Defendant: I understand it, yeah.

Detective McFetridge: And the final question's just asking—

Defendant: Yeah.

Detective McFetridge: — If you're willing to talk to us without an attorney.

Defendant: All right. Yeah.

Graulau proceeded to sign and initial each portion of the rights form, indicating that he understood and waived each of the enumerated rights. He then provided a statement to Detective McFetridge.

After reviewing the video recording of the interrogation, the court found that the State had established beyond a reasonable doubt that Graulau "understood his rights, freely waived those rights and voluntarily gave a statement." Accordingly, the court denied Graulau's suppression motion.

We have reviewed the record and conclude the evidence presented at the Miranda hearing amply supports the trial court's determination that Graulau knowingly and voluntarily waived his Miranda rights. Although Graulau may initially have expressed confusion as to meaning of the term "waive," it is abundantly clear that he was advised of his rights, that he understood those rights, and that he voluntarily agreed to give a statement rather than exercise his right to remain silent or to consult with an attorney. Indeed, the record shows that Graulau was anxious to give a statement. The fact that Graulau at first responded "what?" and then commented that the detective used "big words" does not suggest that he did not understand his rights or the consequences of waiving them by the time he signed the Miranda waiver form. By this point, defendant clearly understood that by agreeing to answer questions, he was giving up his right to remain silent and to consult with an attorney.

We also reject Graulau's claim the trial court should have instructed the jury that he had initially expressed confusion. Instructions along the lines

41

A-3430-17T1

Graulau now suggests were not necessary and would have been misleading. Contrary to Graulau's contention on appeal, the recording does not show that he did not understand his rights. Rather, it shows at most that he did not at first understand the term "waive" as meaning a voluntary relinquishment of those rights. He nonetheless clearly understood that he had the right to exercise the rights that were explained to him and chose instead to answer questions about the incident. The audio-video recording clearly shows that Graulau was willing to give a statement, indeed, was anxious to do so, and answered questions only after signing the waiver form.

VIII.

Graulau next argues for the first time on appeal that his constitutional right to confront the witnesses against him was violated when the trial court allowed Detective McFetridge to summarize an admission that Leeper made to police during a custodial interrogation. Specifically, Detective McFetridge testified:

> He [Leeper] stated that . . . he was present for the assault and robbery of [the victim]. He stated that he was present, however, was attempting to de-escalate the situation, but was unsuccessful. He stated that he later learned that about $120 was taken from the victim, which he later provided to a third party to return to [the

42

victim]. He also stated that one of the suspects involved in the incident had the first name of [N.G.].[13]

Graulau's Confrontation Clause argument is based entirely on this brief portion of Detective McFetridge's testimony. Graulau contends that the detective's synopsis of Leeper's statement impermissibly implicated him in the assault and robbery. We disagree. The portion of Leeper's statement that was relayed to the jury via Detective McFetridge did not expressly incriminate Graulau and was only linked to him through other evidence in the case. Counsel's failure to object or to request a limiting instruction, moreover, supports our conclusion that this isolated portion of the detective's testimony was inconsequential. See Tierney, 356 N.J. Super. at 481–82 ("[F]ailure to 'interpose a timely objection constitutes strong evidence that an error belatedly raised . . . was actually of no moment.'" (quoting State v. White, 326 N.J. Super. 304, 315 (App. Div. 1999))).

The Confrontation Clause guarantees defendants the right to confront their accusers. U.S. Const. amend. VI. In a trial with multiple defendants, "[t]he Confrontation Clause generally forbids admitting testimony of a witness who

---

[13] Leeper's statement referred to N.G. by his first name. Because N.G. was a juvenile at the time of the attack, we use initials to refer to him throughout this opinion. See supra note 3.

directly or indirectly provides information derived from a non-testifying witness that incriminates a defendant at trial." State v. Weaver, 219 N.J. 131, 151 (2014) (citing State v. Branch, 182 N.J. 338, 350 (2005)). In Weaver, the Court noted the "truth finding function" of the Confrontation Clause is "threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination." Id. at 152 (quoting State v. Laboy, 270 N.J. Super. 296, 303 (App. Div. 1994)).

In Bruton v. United States, the United States Supreme Court held that the defendant's right of confrontation was violated by the admission of his codefendant's incriminatory confession notwithstanding that curative jury instructions were later given.[14] 391 U.S. 123, 126 (1968). As the New Jersey Supreme Court recognized in Weaver, the scope of Bruton's protective rule is nonetheless limited. 219 N.J. at 153. In Bruton, the codefendant's confession expressly incriminated the defendant. The United States Supreme Court later clarified that the Bruton protective rule does not apply to a codefendant's statement to police that does not incriminate the defendant "on its face" and is linked to the defendant only through other evidence. Richardson v. Marsh, 481

---

[14] We note that in this case, the trial court did not give a limiting instruction directing the jury to consider defendant Leeper's statement only as evidence against him, and not against defendant Graulau. See infra note 15.

U.S. 200, 208 (1987); cf. Gray v. Maryland, 523 U.S. 185, 192 (1998) (holding that Bruton's protective rule was violated when the codefendant's confession replaced the "defendant's name with an obvious indication of deletion, such as a blank space, the word 'deleted,' or a similar symbol").

In this instance, the portion of Leeper's statement that was presented to the jury by Detective McFetridge did not expressly identify Graulau as a participant in the crime. We note, however, that Leeper's statement does identify N.G., defendant Graulau's brother, as a participant in the criminal attack. Furthermore, Leeper's reference to N.G. as "one of the suspects involved" suggests that another person besides N.G. was involved.[15] A critical question, therefore, is whether Leeper's statement impermissibly identified Graulau by inference.

---

[15] In Richardson, the confession was redacted to "omit all indication that anyone other than" the confessing codefendant and another individual "participated in the crime." 481 U.S. at 203 (emphasis omitted). Thus, the confession only implicated the confessing codefendant and the third party. Gray, 523 U.S. at 191 (citing Richardson, 481 U.S. at 203). The non-confessing defendant was only implicated by the confession after he provided incriminating testimony. Ibid. (citing Richardson, 481 U.S. at 204).

In the present case, Leeper's statement alludes to multiple participants in the criminal episode. Furthermore, the prosecutor in his closing statement addressed Graulau's relationship with his brother, N.G. who was mentioned in Leeper's statement. The State noted in closing that the only reason N.G. was not on trial was his status as a juvenile.

We hold it did not.  Cf. Priester v. Vaughn, 382 F.3d 394, 401 (3d Cir. 2004) (holding Bruton protective rule not violated where confession did not "unavoidably" tie the defendant to the crime).  Rather, Leeper's redacted statement linked Graulau to the crime only through other evidence that was properly admitted.  Weaver, 219 N.J. at 153 (citing Richardson, 481 U.S. at 208).  That evidence included the surveillance video showing Graulau beating the victim, Graulau's own confession to the beating, and the victim's testimony that Graulau said "run his pockets" just before he was robbed.

Even if we were to assume that the reference to Graulau's brother should have been redacted from the detective's summary of Leeper's statement, that reference does not warrant reversal of Graulau's convictions.  As the Court explained in Weaver, "[w]hen evidence is admitted that contravenes not only the hearsay rule but also a constitutional right, an appellate court must determine whether the error impacted the verdict."  219 N.J. at 154–55 (citing Chapman v. California, 386 U.S. 18, 24 (1965)).  "The standard has been phrased as requiring a reviewing court 'to declare a belief that [the error] was harmless beyond a reasonable doubt.'"  Ibid. (alteration in original) (citing Chapman, 386 U.S. at 124); see also Branch, 182 N.J. at 353 (applying the plain error standard where

a defendant fails to object to the erroneously admitted evidence by determining whether the evidence is "clearly capable of producing an unjust result").

In this instance, because defendant's Confrontation Clause claim was not raised below, it is subject to plain error review. R. 2:10-2. This assessment requires an evaluation of the strength of the State's case, State v. Chapland, 187 N.J. 275, 289 (2006), and demands that an error raise a reasonable doubt in the result of the trial before we will disturb a conviction. Tierney, 356 N.J. Super. at 477 (citing State v. Macon, 57 N.J. 325, 336 (1971)).

After reviewing the record in its entirety, we conclude that even assuming for purposes of argument that Detective McFetridge's testimony concerning Leeper's statement was not properly redacted, any such error was harmless beyond a reasonable doubt. With respect to the ambush and assault, Graulau's participation was proved conclusively by the surveillance video, which shows him kicking and stomping the victim's head into the pavement. Moreover, Graulau confessed to the assault after reviewing the video recording of the crime. In short, the State's evidence that Graulau committed aggravated assault is overwhelming. State v. Guzman, 313 N.J. Super. 363, 383–84 (App. Div. 1998) (holding that where the State's evidence, absent the challenged statement,

47

is overwhelming, the plain-error standard does not favor disturbing a defendant's conviction for a Bruton violation).

With respect to the conspiracy to commit robbery conviction, as we have noted, the evidence was circumstantial and thus less overwhelming.[16] Even so, we conclude Detective McFetridge's brief testimony concerning Leeper's statement did not impact Graulau's conspiracy conviction.[17] As we have noted repeatedly, the failure to object to this portion of the detective's testimony suggests that it was of no moment. Tierney, 356 N.J. Super. at 481-82.

We note the trial court did not give a limiting instruction after Detective McFetridge summarized defendant Leeper's statement to police. We believe it would have been appropriate to instruct the jury to consider defendant Leeper's statement only as evidence against him and not against defendant Graulau. Gray, 523 U.S. at 188.

---

[16]  We also note that defendants were acquitted of the substantive offense of robbery.

[17]  Graulau characterizes a portion of Leeper's statement as a reference to Leeper's attempt to make "restitution."  While that statement may have been incriminating as to Leeper's culpability with respect to the robbery, it does not expressly incriminate Graulau and does not suggest that Graulau was part of an agreement to rob the victim.

A-3430-17T1

Graulau's counsel did not request such an instruction. Under the plain-error standard, a failure to deliver the appropriate jury instruction requires reversal only if it raises a reasonable doubt in the result of the trial. Tierney, 356 N.J. Super. at 477 (citing Macon, 57 N.J. at 336). As we have already noted, the State's evidence against Graulau on the assault charge was overwhelming. Although the State's evidence concerning the robbery conspiracy was circumstantial and thus less overwhelming than the proof of assault, we conclude that any error in failing to sua sponte give a limiting instruction to the jury was harmless beyond a reasonable doubt even as to the conspiracy charge.

## IX.

We turn finally to Graulau's contention the trial court imposed an excessive sentence by failing to properly account for his youthful age. Graulau was nineteen-years old when he was sentenced.

As we previously noted, a trial court's sentencing determination is entitled to deference. Fuentes, 217 N.J. at 70.

> The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the

49

sentence clearly unreasonable so as to shock the judicial conscience."

[Fuentes, 217 N.J. at 70 (alteration in original) (quoting Roth, 95 N.J. at 364–65).]

The record makes clear the sentencing court was keenly aware of Graulau's age. The court noted, however, that Graulau had multiple juvenile adjudications of delinquency.

The sentencing court also emphasized that "this was a heinous crime." "The victim," the court explained, "who was powerless, an elderly gentleman, was beaten and kicked. The video was shown to the jury. It was abundantly clear . . . what was occurring to . . . this victim."

It was appropriate in the circumstances of this case for the court to place more weight on the brutality of the attack than on defendant's age, especially considering his history of delinquency. See State v. Hodge, 95 N.J. 369, 378–799 (1984) ("[T]he severity of the crime is . . . the single most important factor in the sentencing process."). In view of the nature of the attack viewed in the context of Graulau's record of juvenile adjudications, we conclude the sentence imposed does not shock the judicial conscience.

To the extent we have not already addressed them, any other arguments raised by Graulau lack sufficient merit to warrant discussion in this written opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3430-17T1